**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| **MSP RECOVERY CLAIMS SERIES 44, LLC, a Delaware entity,** | **Case No.:** |
| **Plaintiff,** |  |
| **v.** | **COMPLAINT** |
|  | **DEMAND FOR JURY TRIAL** |
| **ZURICH AMERICAN INSURANCE COMPANY, an Illinois company,** |  |
| **Defendant.** |  |

## COMPLAINT

Plaintiff, MSP Recovery Claims Series 44, LLC ("MSPRC 44"), a Delaware entity, on behalf of its Designated Series, brings this action against files this Complaint against Zurich American Insurance Company ("Zurich" or "Defendant") and alleges:

### INTRODUCTION

1.      More than forty years ago, Congress passed the Medicare Secondary Payer Act (the "Act" or "MSP Act") to deal with ballooning medical entitlement costs, by transforming Medicare from the entity that always foots the bill, into a safety net for the medical expenses of beneficiaries who also were covered by private plans and insurers such as Zurich.

2.      Six years later, Congress recognized that it needed to do more to make this transformation effective and amended the MSP Act to add a private cause of action so persons and private entities could recover secondary payments made by Medicare (and later, by Medicare

Advantage Organizations ("MAOs"))[1] that private plans and insurers had failed to reimburse. Congress provided for double damages, so that private litigants would be motivated to take arms against a recalcitrant insurer.

3.      In 1997, Congress created the "Medicare Advantage" option under Part C of Medicare, 42 U.S.C. § 1395w-21(a)(1)(B), with the hope that Medicare Advantage would eclipse traditional Medicare. Under Medicare Advantage, Medicare beneficiaries receive their Medicare benefits from a private health insurer, which are known as Medicare Advantage Organizations or "MAOs." Today, nearly 40% of all Medicare beneficiaries receive their benefits under a Medicare Advantage Plan.

4.      Even though it is settled law that MAOs have parity of recovery rights, insurers have disregarded for more than a decade their repayment obligations to MAOs. That failure improperly depletes the trust funds that support Medicare Advantage, which are the same trust funds that support Medicare Parts A and B. *See* 42 U.S.C. § 1395w-23(f). Accordingly, Congress' mandate that Medicare shall not be the entity that always foots the bill is still a long way from being implemented. This case seeks to reconcile, in a structured and fair way, claims for reimbursement that Zurich owes to MAOs that assigned their rights to MSPRC 44, which will more effectively implement Congress' original intent in passing the MSP Act.

## QUINCY'S DUTIES TO MEDICARE AND MAOS

5.      Zurich is a property and casualty insurer that is in the business of collecting

---

[1] MAOs include Medicare Service Organizations, Independent Physician Associations, and other first tier and downstream entities (collectively, "MAOs"). As explained in caselaw, "some MAOs contract with smaller organizations, like independent physician associations, that have closer connections to local healthcare providers. These smaller organizations, or 'downstream' actors, are also a part of the Medicare Advantage system . . . ." *MSP Recovery Claims, Series LLC v. ACE Am. Ins. Co.*, 974 F.3d 1305, 1308 (11th Cir. 2020), *cert. denied*, 141 S. Ct. 2758 (2021).

premiums in exchange for taking on the risk that its insureds will be injured and Zurich will be contractually obligated to pay for its insured's accident-related medical care. Zurich also collects premiums in exchange for taking on the risk that its insureds will injure someone else and Zurich will be required to indemnify its insureds, typically through a settlement agreement that releases the third-party claimant's claim for accident-related medical care.

6. Under both circumstances, Zurich falls within the MSP Act's definition of a "primary plan," which includes "an automobile or liability insurance policy or plan (including a self-insured plan) or no-fault insurance." 42 U.S.C. § 1395y(b)(2)(A). As a primary plan, Zurich is charged with two duties under the Act: (1) to notify the secondary payer (whether it be Medicare or an MAO) of Zurich's primary payer status, and (2) to repay the secondary payer, within 60 days. 42 U.S.C. §§ 1395y(b)(2)(B)(ii), 1395w-22(a)(4).

7. If Zurich is rendered a primary plan and fails to repay the Medicare lien within 60 days, the MSP Act automatically gives rise to a right to bring an action such as this one. Failure to reimburse Medicare or MAOs for accident-related medical payments effectively results in a windfall for Zurich, to the detriment of the Medicare trust funds and taxpayers.

**PARTIES, JURISDICTION, AND VENUE**

8. MSPRC 44, is a Delaware series limited liability company with a principal place of business located at 2701 S. Le Jeune Road, 10th Floor, Coral Gables, Florida 33134.

9. MSPRC 44 is a Series LLC. Under Delaware law, a Series LLC operates similarly to, but not the same as, a corporation and its subsidiaries. MSPRC 44 is the master LLC. Each individual Series entity forms a part of MSPRC 44, and MSPRC 44 owns and controls each individual Designated Series entity.

10. MSPRC 44 established various designated series pursuant to Delaware law in order

to maintain various claims recovery assignments separate from other company assets, and to account for and associate certain assets with certain series. All Designated Series form a part of MSPRC 44, and pursuant to MSPRC 44's limited liability agreement and applicable amendment(s), each designated series is owned and controlled by MSPRC 44.

11.     Unlike a traditional corporate subsidiary and parent relationship, a series need not be a separate legal entity. As one commentator has explained,

> [a] series LLC authorizes an extraordinary type of membership interest—one that neither pertains to nor partakes of an entire LLC but rather is associated with and segregated to a compartmentalized set of assets, profits, losses, and liabilities. An LLC statute that authorizes series LLCs permits an LLC to compartmentalize its operations and create 'internal' shields to protect assets associated with one aspect of the business from claims pertaining to others. Under a series provision, an LLC may associate specified assets and operations with a particular series of membership interests and limit claims and obligations pertaining to those interests and operations to the specified assets.

Daniel S. Kleinberger, Carter G. Bishop, *The Next Generation: The Revised Uniform Limited Liability Company Act*, 62 Bus. Law. 515, 541 (2007) (internal citation and quotation marks omitted) (alteration adopted).

12.     Thus, MSPRC 44 may either (1) receive assignments directly to it from third party MAOs in the name of MSPRC 44 and further associate such assignments with a particular Series, or (2) may have an MAO's claims assigned directly to a particular Designated Series. In either event, MSPRC 44's agreements with its Designated Series give it the right to sue on behalf of each Designated Series and pursue any and all rights, benefits, and causes of action arising from assignments to a Designated Series by way of its limited liability agreement. MSPRC 44's right to sue on behalf of its Designated Series is reinforced by the "Certificate of Designation" that creates the Designated Series and specifically states that MSPRC 44 may sue on its behalf.

13.     As permitted under Delaware law, MSPRC 44's limited liability agreement vests

in the master LLC the right to initiate and maintain legal proceedings on behalf of its Designated

Series entities individually or collectively. Any claim or suit may be brought by MSPRC 44 in its

own name, or in the name of its Designated Series, individually or collectively.

14.     MSPRC 44 specifically alleges it possesses valid assignments to bring actions for

seeking redress for all claims described herein.

15.     Series 44-20-456 is a Designated Series entity of MSPRC 44 with its principal place

of business at 2701 S. Le Jeune Road, 10th Floor, Coral Gables, Florida 33134. Series 44-20-456

is a Designated Series entity of MSPRC 44 with its principal place of business at 2701 S. Le Jeune

Road, 10th Floor, Coral Gables, Florida 33134. Series 44-20-456's Certificate of Designation,

dated October 22, 2020, provides that MSPRC 44 may assert all of the same rights as Series 44-

20-456 and may sue on Series 44-20-456's behalf: "For avoidance of doubt, (i) any and all rights,

benefits, and causes of action arising from assignments of claims to [Series 44-20-456] form part

of [MSPRC 44's] assets, (ii) the [MSPRC 44] has the right and authority to seek reimbursement

of Medicare payments in respect of any such assigned claims, whether in the name of [Series 44-

20-456] or [MSPRC 44], and (iii) [MSPRC 44] maintains the legal right to sue on behalf of [Series

44-20-456] . Any claim or suit capable of being asserted or brought by [Series 44-20-456] may

be brought by [MSPRC 44] (on behalf of itself or in the name of the Series)."

16.     MSP made a good faith effort to accurately identify Zurich in this Complaint, in

reliance on information obtained from Zurich's website and MyAbility, which is part of Ability

Network.  MyAbility allows companies, such as MSPRC 44, to access data that primary payers

report to the Centers for Medicare & Medicaid Services ("CMS"), pursuant to Section 111 of the

Medicare Medicaid and SCHIP Extension Act of 2007. Reporting data attached as **Exhibit A** to

this Complaint is taken directly from data inputted by Zurich to CMS, either directly or through

its vendor. Accordingly, any inaccuracy or lack of specificity in the data is attributable to Zurich.

17.     Any time Zurich receives a claim for accident-related insurance benefits, the MSP Act requires Zurich to "determine whether the claimant . . . is entitled to [Medicare] benefits[.]" 42 U.S.C. § 1395y(b)(8)(A)(i). If that claimant is indeed a Medicare-eligible beneficiary, Zurich must then provide a Section 111 to CMS at a time "after the claim is resolved [by Zurich] through a settlement, judgment, award, or other payment (regardless of whether or not there is a determination or admission of liability)." 42 U.S.C. § 1395y(b)(8)(A)(ii). Therefore, when Zurich makes a Section 111 report to CMS, it is admitting it made a "payment" to a Medicare-eligible beneficiary, and that the purpose of Zurich's payment was to "resolve" the beneficiary's accident-related claim for medical benefits.

18.     By making such a payment, as admitted in its Section 111 report, Zurich demonstrates it is the "primary plan," which means Zurich must reimburse Medicare for any conditional payments Medicare made that relate to the beneficiary's accident.  Under the MSP Act, "a primary plan must reimburse Medicare for [its] conditional payments 'if it is demonstrated that such primary plan has or had a responsibility to make payment with respect to such item or service.' . . . A primary plan's responsibility for payment may be shown by: a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment for items or services included in a claim against the primary plan or the primary plan's insured . . . ." *MSP Recovery Claims, Series LLC v. Metro. Gen. Ins. Co.*, 40 F.4th 1295, 1299 (11th Cir. 2022) (citing 42 U.S.C. § 1395y(b)(2)(B)(ii)).

19.     Given this statutory framework, MSPRC 44 may justifiably rely on Zurich's reporting to identify Zurich as the primary plan for the beneficiaries identified in this case.

20.     Zurich is an insurer who issues liability and no-fault policies and is incorporated in the state of New York. According to its public filings with the Securities and Exchange Commission, as well as its representations in recent court appearances, "Zurich American Insurance Company is a New York corporation with a principal place of business in Illinois." *Zurich Am. Ins. Co. v. Centimark Corp.*, No. 6:21-CV-00644-MC, 2021 WL 2744505, at *1 (D. Or. July 1, 2021) (quoting Zurich's allegations as to its corporate citizenship).

21.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331.

22.     Venue is proper in this District pursuant to 28 U.S.C. §§1391 (b), (c), and (d) because at all times material hereto, Zurich resided, transacted business, was found, or had agents in this District, and a substantial portion of the alleged activity affecting trade and commerce discussed below has been carried out in this District.

23.     This Court has personal jurisdiction over Defendant because it is at home in this forum, and personal jurisdiction over Zurich does not offend traditional notions of fair play and substantial justice.

## STANDING ALLEGATIONS

24.     MSPRC 44 uncovers MSP Act noncompliance through data analytics, which requires cross-referencing unreimbursed, accident-related conditional payments in their assignors' claims data with instances where insurers reported to CMS under Section 111 that they were responsible for those same accidents. These Section 111 reports make the insurers primary payers under the MSP Act as a matter of law. While MSPRC 44 has no direct access to the Section 111 reporting, MSPRC 44 obtains reports from a subscription service that contracts with CMS and provides to subscribers what primary payers report to CMS.

25.     While this cross-referencing exercise may be successful in identifying some unreimbursed conditional payments, the bulk of those payments remain hidden without discovery. This is so because insurers either failed to report all their claims pursuant to Section 111 (which until this year, resulted in no penalty) or withdrew their reports prior to detection by an MAO. The only way to fully identify all secondary payments that insurers failed to reimburse is by comparing an MAO's and an insurer's claims data.

26.     For the above reasons, the accurate and complete amount of MSPRC 44's damages cannot be known until after Zurich has produced lists of no-fault and third-party claims that it settled. Accordingly, and solely for the purpose of demonstrating standing to pursue claims against Zurich, and to obtain the discovery MSPRC 44 needs, the following example of Zurich's failure to reimburse and comply with the MSP Act is alleged below.

## **Assignment Allegations**

27.     MSPRC 44's claims in this lawsuit stem from its assignment agreement with Health First Health Plans, Inc. ("HFHP"), an MAO.  Effective April 28, 2016, HFHP irrevocably assigned all rights to recover payments made on behalf of its Enrollees to MSP Recovery, LLC (the "HFHP Assignment"). The HFHP Assignment expressly provides, in pertinent part:

> Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto . . . all of which shall constitute the "Assigned Claims."

> . . .

The transfer, grant, right, or assignment of any and all of Client's right, title, ownership, interest and entitlements in and to the Assigned Claims shall remain the confidential and exclusive property of MSP Recovery or its assigns. This assignment is irrevocable and absolute.

HFHP Assignment, at 1-2.[2]

28.     On June 12, 2017, MSP Recovery, LLC assigned all rights acquired under the HFHP Assignment to Series 16-05-456, a designated series of MSPRC (the "Series Assignment I"). The Series Assignment I states:

[T]he undersigned Assignor . . . irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the Claims and Assigned Claims, (and all proceeds and products thereof, including any related assigned assets and assigned documents) as such terms are defined or contained in that certain (1) Assignment and (2) Addendum to the Recovery Agreement and Assignment Addendum, both given and effective April 28, 2016 and executed on June 1, 2018, by and between Health First Health Plans, Inc., a Florida corporation and Medicare Advantage Organization and party to contract number H1099 with The Centers for Medicare & Medicaid Services, as the "Client" and health plan assignor, and [MSP Recovery], a Florida limited liability company (the "Assignment"); irrespective of when the claims were vested in Client, inclusive of any and all claim(s), causes of actions, proceeds, products and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party pursuant to the Assignment from the Client, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims and all information relating thereto.

Series Assignment I, at 1.

---

[2] The agreements entered between MSP Recovery, Health First Administrative Plans, and Health First Health Plans have been the subject of much litigation over the last three years. However, the Court of Appeals for the Eleventh Circuit, in *MSP Recovery Claims, Series LLC v. QBE Holdings, Inc.*, 965 F.3d 1210 (11th Cir. 2020), held that the HFHP Assignment properly assigned the claims and is the relevant document that provided MSP standing to assert HFHP's recovery rights.

29.     Further, on October 22, 2020, Series 16-05-456 entered into an assignment agreement with Series 44-20-456, a designated series of Series 44, whereby it irrevocably assigned all rights it acquired through its assignment agreement with MSP Recovery, LLC ("Series Assignment II"). The Series Assignment II was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties, and was entered into under Florida law:

> [Series 16-05-456] . . . hereby irrevocably assigns, transfers, conveys, sets over, and delivers to [Series 44-20-456] and its successors and assigns, (i) any and all of Assignor's right, title, ownership, and interest in and to the [claims], as well as (ii) the "Claims" and "Assigned Claims", and all proceeds and products thereof (collectively the "Assigned Claims") as such terms are defined in the Agreements.

> This Assignment includes all the Assigned Claims irrespective of when the claims were vested in HFHP, inclusive of any and all claim(s), causes of actions, proceeds, products, and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to HFHP arising from or relating to the Claims and all information relating thereto.

Series Assignment II, at 1.

30.     Consideration was given between each party in executing these assignments.

31.     At the time of the initial April 2016 HFHP Assignment, and at all times since, HFHP has possessed ripe MSP Act claims for reimbursement against Zurich. Thus, each time HFHP assigned claims to MSPRC 44 (through its Designated Series), HFHP was in an ongoing relationship with Zurich, based on Zurich's ongoing and continuous statutory duty to reimburse HFHP for conditional payments made to Medicare beneficiaries. Additionally, the April 2016 HFHP Assignment provided that later claims may be assigned as part of HFHP's ongoing transfers of electronic claims data:

> [HFHP] acknowledges that Claims that arise after the Effective Date of this Agreement ("Prospective Claims") shall also be assigned to MSP Recovery as [HFHP's] data is transferred to MSP Recovery for Claims' analysis and to pursue possible recovery on the Assigned Claims.

In accordance with this express provision, HFHP has repeatedly made further data transfers in connection with its assignment of further claims against Zurich to MSPRC 44 (as the assignee of MSP Recovery, LLC).

32.     Effective January 1, 2021, Series 44-20-456, a Designated Series of MSPRC 44, purchased HFHP's remaining payment interest in the claims at issue in this lawsuit, including all claims with dates of service ranging from February 5, 2007 through January 3, 2020 (the "Purchase Agreement"). The Purchase Agreement ratified HFHP's previous assignment of claims to MSPRC 44 in connection with ongoing data transfers since the effective date of the HFHP Assignment. In referencing the prior HFHP Assignment as the "Recovery Agreement," the Purchase Agreement provides:

> From the effective date of the Recovery Agreement through the date of this Purchase Agreement, Assignor made various transfers of data to MSP Recovery allowing analysis and identification of reimbursable recoveries. The data transmitted by Assignor to MSP Recovery ("Claims Data") occurred on the dates: June 8, 16, November 7, 2016, December 6, 2016, February 6, 2020 and February 24, 2020. and thus. all (claims arising therefrom are deemed Assigned Claims. The Claims Data transmitted by Assignor to MSP Recovery on June 8. 2016, November 7, 2016 and December 6, 2016, which encompassed dates of service between February 5, 2007 and November 23, 2016 were the subject of a stand-alone Assignment document signed by Assignor on June l. 2018 and made effective as of April 28, 2016. The Claims arising from the Claims Data transmitted by Seller to MSP Recovery February 6, 2020 and February 24. 2020 are also deemed Assigned Series 44-20-456 currently owns all of the right, title and interest in the Assigned Claims.
>
> . . . The Parties Wish to enter into this Purchase Agreement in order for Purchaser to acquire Seller's Contingent Payment Interest (as defined below) in exchange a lump sum payment as described herein.

Purchase Agreement, at Preliminary Statement, §§ C, D.  The Purchase Agreement then provides

that "[HFHP] sells all of [HFHP's] rights" under the prior HFHP Assignment and later data transfers, "including any amount payable to [HFHP] by MSP Recovery, [Series 44-20-456], or any of their affiliates or assigns that have accrued prior to and up to the Effective Date of this Purchase Agreement." *Id.*, at § 1.1. Through this language, MSPRC 44, through its Designated Series, Series 44-20-456, purchased any remaining interest HFHP may have retained as it relates to payment from recoveries for previously-assigned claims, including for the beneficiaries identified in this lawsuit. The Purchase Agreement provides that it is governed by Florida law.

33.    This Complaint seeks recovery only for claims HFHP assigned to MSPRC 44 through its Designated Series (Series 44-20-456). All claims at issue in this Complaint, and all claims data currently in MSPRC 44's possession, were assigned to MSPRC 44, either through the original written HFHP Assignment, HFHP's subsequent assignments in connection with ongoing data transfers (as ratified in the Purchase Agreement), or through the even more comprehensive Purchase Agreement. Indeed, MSPRC 44 is only in possession of the claims data for each beneficiary identified in this lawsuit because HFHP provided that data to MSPRC 44 as part of the aforementioned assignments.

34.    Finally, the April 2016 HFHP Agreement provided that "[HFHP] must provide MSP Recovery with a written list specifically identifying and describing Client's existing subrogation cases and only those claims and cases that Client specifically identifies and communicates to MSP in writing shall be excluded from the Assigned Claims." Art. IV, § 4.1. Before filing this lawsuit, MSPRC 44 verified, through a review of HFHP's records, that the claims at issue do not include any that HFHP or its beneficiaries were pursuing through litigation at the time the claims were assigned. In this manner, MSPRC 44 confirmed that the claims are at issue not subject to any carveout in any assignment agreement.

35.     Consideration was given between each party in executing these assignments.

**The Settlement Representative Beneficiary**

36.     In exchange for premiums, Zurich may take on the risk of loss and accident-related medical expenses incurred by third parties who suffered an injury induced by either its customers and/or their covered property. When these instances arise, Zurich executes a settlement agreement on behalf of its insured with the covered persons.

37.     When Zurich executes a settlement agreement with a covered person, who is enrolled in a Medicare plan, Zurich becomes a primary payer that is responsible for the reimbursement of the medical services rendered to the covered person. Zurich's duty to reimburse conditional payments made by Medicare participants for the health services rendered is nondelegable. Zurich may not transfer its responsibility for reimbursement to covered persons or other third parties.

38.     After executing settlement agreements, such as the one identified below, Zurich failed to provide actual notice of its primary payer status to HFHP when it paid for the beneficiaries' medical expenses. Zurich may not rely on state law to shirk its federal statutory reimbursement obligations to the Medicare system. Zurich may not sit, wait, derelict its federal affirmative duties and then invoke absolution under state law.

**M.B.**

39.     On June 6, 2018, M.B. was enrolled in a Medicare Advantage Plan issued by HFHP, an MAO and MSPRC 44's Designated Series assignor in this action.

40.     On June 6, 2018, M.B. was injured in an accident. As a direct and proximate result of the accident, M.B. sustained injuries that required medical items and services.

41.     At the time of the accident, M.B.'s accident-related medical costs and expenses

were covered under a liability policy issued by Zurich. According to Zurich's reporting to CMS, the plan that ultimately covered M.B.'s medical costs fell under policy number 5538637. By virtue of that policy, Zurich was contractually obligated to pay and provide primary coverage for M.B.'s accident-related medical expenses.

42.    A list of M.B.'s diagnosis codes and injuries in connection with M.B.'s accident-related treatment is attached hereto as **Exhibit B**. The codes used are standard medical industry codes, which correspond to specific treatments and procedures. These codes are well known to Zurich and can be found through a simple Internet search. For further information on the format of this claims data, *see* Appendix.

43.    M.B.'s accident-related medical services were rendered from June 6, 2018 to September 20, 2018. The medical providers subsequently issued bills for payment of M.B.'s accident-related medical expenses to HFHP. The medical providers billed and charged HFHP $18,556.95 for M.B.'s accident-related medical expenses, of which HFHP paid $1,170.39. (**Exhibit B**). At the time HFHP assigned the M.B. claim in favor of Series 44-20-456, HFHP's right to seek reimbursement for M.B.'s accident-related treatment was never assigned to and/or pursued by other recovery vendors. HFHP held all recovery rights to M.B.'s accident-related treatment and conveyed them to MSPRC 44. HFHP did not retain the recovery right to M.B.'s claim.

44.    By virtue of its no-fault policy which covered M.B., Zurich is a primary payer responsible for payment and/or reimbursement of M.B.'s accident-related medical expenses.

45.    In fact, Zurich issued a Section 111 report to CMS regarding the accident, the name of the reporting entity, and the type of insurance policy involved, and admitted its primary payer status related to payment and/or reimbursement of M.B.'s accident-related medical expenses.

(**Exhibit A**).

46.     This reporting demonstrates Zurich was aware of its responsibility to reimburse HFHP.

47.     Despite reporting it was a primary payer, and the corresponding admission it should have paid for M.B.'s accident-related injuries, Zurich failed to remit and/or reimburse such payments.

48.     Zurich was aware of its MSP Act responsibility to reimburse conditional payments advanced for medical services rendered to M.B. Zurich was also aware of its 42 C.F.R. § 411.24(f)(2) duty to notify the Medicare carrier that paid for M.B.'s medical expenses, in this instance HFHP. Zurich did not notify HFHP of its primary responsibility to pay for M.B.'s medical expenses.

49.     Zurich's awareness is further demonstrated by its response to MSPRC 44's attempt to collect the amounts owed for M.B.'s claim. On June 2, 2022, Zurich admitted it "did search for information on [Zurich's] claim system concerning" M.B., and that Zurich "has a record of a claim involving M.B."

50.     In issuing this response, Zurich protested that it "was not the insurer" of M.B. This comment was and is legally irrelevant, as Zurich's duty to reimburse Medicare applies equally where Zurich insures the tortfeasor that harmed M.S. According to Zurich's Section 111 reporting to CMS, "Zurich American Insurance Compan" [sic] was an insurer that paid for the M.B. claim. The same reporting list the type of insurance issued by Zurich as "other liability"—a designation used in instances when the insurer, Zurich, has insured the tortfeasor that harmed M.B.

51.     Zurich's letter vaguely hinted, but did not say, that a different Zurich entity may have paid for M.B.'s claim. Zurich claiming that it "has a record of the proper insurer paying

medical bills for [M.B.]." Despite this cryptic language, however, the entity that reported to CMS identified itself as "Zurich American Insurance Compan." MSPRC 44 is thus relying on Zurich's reporting to the government to support the allegation that Zurich was the entity that paid for some of M.B.'s accident-related treatments and, as a result, became the primary payer for this incident under the MSP Act.

52.     The sheer obfuscation Zurich engaged in with respect to M.B. illustrates the difficulty MSPRC 44 faces in trying to obtain the coordination of benefits that the MSP Act mandates. By refusing to openly share information about claims for which it has admitted to being the primary payer, Zurich has flouted its legal obligations under 42 C.F.R. § 411.25(a) and 59 Fed. Reg. 4285.

53.     In the time since the incident, Zurich has enjoyed the use of HFHP's funds to the detriment of the Medicare system.

54.     MSPRC 44 expended a great deal of effort and resources to uncover Zurich's failures in the handling of claims, such as the identified M.B. incident, and the unjust enrichment Zurich has benefitted from during this period of noncompliance. As HFHP's assignee, MSPRC 44 instituted this action to recover the debt.

55.     Accordingly, MSPRC 44 is entitled to collect double damages against Zurich for its failure to reimburse HFHP's conditional payments for beneficiaries' accident-related medical expenses.

**The No-Fault Claim**

56.     Pursuant to 42 C.F.R. § 411.24(f)(1), Medicare "may recover without regard to any claims filing requirements that the insurance program or plan imposes on the beneficiary or other claimant such as a time limit for filing a claim or a time limit for notifying the plan or program

16

about the need for or receipt of services." Zurich failed to provide actual notice of the existence

either its no-fault policies, its self-executing contractual obligation for the beneficiaries' medical

expense, or its responsibility for reimbursement to MSPRC 44's assignor who is a MAO who paid

for the beneficiaries' medical expenses.

57.     In the same vein, Zurich may not rely on state law to shirk its federal statutory

reimbursement obligations to Medicare and its federal regulatory obligation to provide notice to

the Medicare Participant that paid for medical expenses covered by its insurance policies. 42 C.F.R

§§ 411.24(f)(2), 422.108(f), and 422.402.

## COUNT I
## PRIVATE CAUSE OF ACTION UNDER 42 U.S.C. § 1395Y(B)(3)(A)
### (as to HFHP's unreimbursed payments)

58.     MSPRC 44 re-alleges and incorporates herein by reference each of the allegations

contained in the preceding paragraphs 1-57 as if fully set forth herein.

59.     Zurich's no-fault and liability policies are primary plans, which rendered Zurich

the primary payer for its beneficiaries' accident-related medical expenses.

60.     As part of providing Medicare benefits under the Medicare Advantage program,

Fallon paid for items and services which were also covered by no-fault, personal injury protection,

or medical payments policies issued by Zurich.

61.     Zurich entered into settlements with beneficiaries relating to accidents but failed to

reimburse Fallon for accident-related medical expenses paid by HFHP. As a primary payer, Zurich

had a nondelegable duty to reimburse conditional payments advanced by Medicare participants for

medical services rendered to beneficiaries. Zurich is liable for reimbursement of these accident-

related medical expenses, even if it subsequently paid out the maximum benefits under the policies.

62.     Zurich was required to timely reimburse Fallon for conditional payments made on

behalf of beneficiaries' accident-related medical expenses.

63.     HFHP suffered damages as a direct result of Zurich's failure to comply with its statutory and regulatory duties under the MSP Act and the corresponding Code of Federal Regulations.

64.     Zurich derived substantial monetary benefit by placing the burden of financing medical treatments on HFHP.

65.     Zurich failed to administratively appeal HFHP's rights to reimbursement within the administrative remedies period. Zurich, therefore, is time-barred from challenging the propriety, reasonableness, and necessity of the amounts paid.

66.     MSPRC 44 only seeks to recoup medical services rendered to beneficiaries that were related to the accidents.

67.     MSPRC 44 brings this claim pursuant to 42 U.S.C. § 1395y(b)(3)(A), to recover double damages from Zurich for its failure to make appropriate and timely reimbursement of conditional payments for beneficiaries' accident-related medical expenses.

**COUNT II**
**Declaratory Relief Pursuant to 28 U.S.C.**
**§ 2201 (as to HFHP's unreimbursed payments)**

68.     MSPRC 44 re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs 1-57 as if fully set forth herein.

69.     MSPRC 44 alleges that as part of providing Medicare benefits under the Medicare Advantage program, HFHP paid for items and services which were also covered by no-fault, personal injury protection, or medical payments policies issued by Zurich.

70.     Zurich entered into settlements with beneficiaries relating to accidents but failed to reimburse HFHP for accident-related medical expenses paid by HFHP. As a primary payer, Zurich had a nondelegable duty to reimburse conditional payments advanced by Medicare participants for

accident-related medical services rendered to covered persons. Zurich is liable for reimbursement of these accident-related medical expenses, even if it subsequently paid out the maximum benefits under the policies.

71.     Zurich was required to timely reimburse HFHP for conditional payments made on behalf of beneficiaries' accident-related medical expenses.

72.     An actual, present, and justiciable controversy has arisen between MSPRC 44 and Zurich concerning its obligation to reimburse HFHP.

73.     MSPRC 44 seeks a declaratory judgment from this Court establishing that Zurich has a historical, present, and continuing duty to reimburse HFHP for payments made on behalf of beneficiaries' accident-related medical expenses. MSPRC also seeks a declaration of what amounts are due and owing by Zurich to HFHP.

74.     A determination of what amounts are owed by Zurich to HFHP is complicated and difficult.

75.     A coordination of benefits process requires plans to share information between the primary payer and secondary plan and to act in good faith.

76.     The Code of Federal Regulations defines the coordination of benefits system as a "coordination of benefits transaction."[3]

77.     The coordination of benefits transaction involves the exchange of thousands of claims data and data points between the parties to determine overlapping instances where HFHP made payment of medical items and services on behalf of a Medicare beneficiary who was entitled

---

[3] The "coordination of benefits transaction" is the transmission of claims data from any entity to a health plan for the purpose of determining the relative payment responsibilities of the health plan, of either of the following for health care: (a) claims and (b) payment information. 45 C.F.R. § 162.1801.

to the benefit of insurance coverage provided by Zurich. This includes not only instances in which a Medicare beneficiary was directly insured by Zurich, but also instances in which a Medicare beneficiary was injured by Zurich's policyholder.

78.     The exchange of claims data would need to be done by extracting and producing certain data fields from Zurich's and MSPRC 44's databases by using demographic identifiers, such as Social Security Number ("SSN"), Health Insurance Claim Number ("HICN"),[4] date of birth, sex, and address. Beneficiary matching pinpoints the number of relevant insureds and simplifies the process of identifying reimbursable claims, which is done by matching the date of loss (for Zurich), with dates of payment (for MSPRC 44), and then discovering what Zurich reimbursed (if anything), and to whom.

79.     The data MSPRC 44 requests from Zurich to perform an accounting is information MSPRC 44 is already entitled to without litigation. 42 C.F.R. § 411.25(a); 59 Fed. Reg. 4285.

80.     Zurich refused to share transparent information concerning MSPRC 44's claims with respect to representative beneficiaries, including those beneficiaries who received Medicare benefits from HFHP. An illustrative example of Zurich's obfuscation is alleged in paragraphs 41-44.

81.     Given the size of the claims and data points being exchanged between the parties, the coordination of benefits transaction is complex.

82.     An equitable accounting of the amounts owed MSPRC 44 by Zurich is proper because the facts and accounts presented are so complex that adequate relief may not be obtained at law.

---

[4] Also known as a Medicare Beneficiary Identifier ("MBI").

83.     MSPRC 44 is entitled to an accounting of all instances where Zurich settled a tort claim under a third-party insurance policy or accepted coverage under a first party insurance policy. This accounting should include, at a minimum, the identity of each claimant for whose benefit HFHP provided or paid for items or services.

84.     MSPRC 44 has attempted to coordinate with Zurich for an exchange of information at to numerous beneficiaries, but Zurich ignored or resisted these efforts. Nevertheless, with the filing of this lawsuit, MSPRC 44 is again attempting to coordinate with Zurich with respect to the representative beneficiary described herein.

85.     Thus, MSPRC 44 lacks an adequate legal remedy to obtain the requested information, and an accounting is the appropriate remedy.

## <u>JURY TRIAL DEMAND</u>

MSPRC 44 demands a trial by jury on all of the triable issues within this pleading.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, MSPRC 44 seeks a judgment granting the following relief:

i.      a judgment awarding reimbursement of double damages for those amounts to which MSPRC 44 is entitled under 42 U.S.C. § 1395y(b)(3)(A), as alleged in Count I;

iii.    a judgment declaring that Zurich has a historical, present and continuing duty to reimburse HFHP for payments made on behalf of beneficiaries' accident-related medical expenses as alleged in Count II;

iv.     a judgment ordering an accounting of all instances where Zurich settled under a third-party insurance policy or accepted coverage under a first party insurance policy, including the identity of each claimant, or if known to

Zurich, claimants for whose benefit HFHP provided or paid for items or services;

v.     a judgment awarding MSPRC 44 pre-judgment and post-judgment interest consistent with the statute; and

vi.     a judgment awarding MSPRC 44 such other and further relief as the Court deems just and proper under the circumstances.

Dated: September 16, 2022.

Respectfully submitted,

Virginia A. Whitener
IL Bar No.: 6337452
Milberg, Coleman, Bryson, Phillips, Grossman, PLLC
Attorneys for MSPRC 44
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Tel.: 865-247-0080
Primary Email: gwhitener@milberg.com

By: */s/ Virginia A. Whitener*

## APPENDIX

### CMS' Standard for Storing Digital Health Insurance Claims Data

1.     It is the custom and practice of CMS and Primary Payers to maintain records in a detailed electronic format. According to the U.S. Department of Health and Human Services (HHS), CMS, federal statutes, and industry best practices and guidelines, the standard format for storing digital health insurance claims data is an electronic data interchange ("EDI") format called 837P ("837").

     a.   The 837 standard is mandated by the federal government and used federal and state payors such as Medicare and Medicaid.

     b.   The 837 standard is also used by private insurers, hospitals, clinics, physicians and other health care providers (i.e., HIPAA covered entities) who typically adopt CMS standards.

     c.   Paper claims are captured in the CMS 1500, UB04, and UB92 forms, but electronically, the standard for storing data is the 837 format.

2.     Essential components of an 837-claim file include but are not limited to the date(s) of service, diagnosis code(s) and medical procedure code(s).

     a.   <u>Dates (including dates of service)</u>: the standard format for dates in electronic health care claims is YYYYMMDD, CCYYMMDD, or MM/DD/YYYY.

         i.   According to industry best practices and guidelines, and HHS and CMS, the standard format for expressing dates in healthcare insurance claims data is CCYYMMDD (CC representing two numeric digits to indicate Century, YY representing two numeric digits for year, MM representing two digits for the month, and DD representing two digits for the day of the month). Sometimes this is alternately expressed as YYYYMMDD.

    ii.  [1]

    iii.  The CCYYMMDD date format standard has been in place for many years.

        *See* CMS Guidance for 2010[2], 2011[3], 2012[4], 2013[5], 2014[6], and 2016.[7]

    iv.  CMS has also accepted the MM/DD/YYYY format for its local coverage

---

[1] *See* the Medicare Claims Processing Manual Chapter 3 and CMS Manual System, Pub 100-08 Medicare Program Integrity, Transmittal 721.

[2] CMS Manual System, Pub 100-20 One-Time Notification, Transmittal 761 (Aug. 20, 2010), *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/downloads/R761OTN.pdf.

[3] CMS Manual System, Pub 100-20 One-Time Notification, Transmittal 988 (Oct. 28, 2011), *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/downloads/R988OTN.pdf.

[4] CMS Manual System, Pub 100-20 One-Time Notification, Transmittal 1050 (Feb. 29, 2012), *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R1050OTN-.pdf.

[5] CMS Manual System, Pub 100-20 One-Time Notification, Transmittal 1277 (Aug. 9, 2013), *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/downloads/R1277OTN.pdf.

[6] Memorandum from Tracey McCutcheon, Acting Director, Medicare Drug Benefit and C & D Data Group, and Laurence Wilson, Director, Chronic Care Policy Group, to All Part D Plan Sponsors and Medicare Hospice Providers (Mar. 10, 2014) (on file with author), *available at* https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/Hospice/Downloads/Part-D-Payment-Hospice-Final-2014-Guidance.pdf.

[7] Memorandum from Cheri Rice, Director, Medicare Plan Payment Group, and Cathy Carter, Director, Enterprise Systems Solutions Group, to All Medicare Advantage, Prescription Drug Plan, Cost, PACE, and Demonstration Organizations Systems Staff (Nov. 9, 2016) (on file with author), *available at* https://www.cms.gov/Research-Statistics-Data-and-Systems/CMS-Information-Technology/mapdhelpdesk/Downloads/Announcement-of-the-February-2017-Software-Release.pdf.

determination data.[8]

    v.    The purpose of the date format is to ensure that dates of health care claims such as the date a medical procedure was provided (date of service or "DOS") in comparison to the date of settlement, can be searched, sorted and properly selected as compensable or non-compensable claims.

    vi.    In general, ensuring the accuracy of dates, and other data is essential to analyzing claims data files by health insurers and others who may need to determine the value of claims, the relevance of particular claims with respect to patient conditions, dates of care, or whether the claim is compensable.

  b.  <u>Medical Diagnosis and Procedure Codes</u>:

    i.    Diagnosis-Related Group (DRG) – DRGs are a statistical system of classifying any inpatient stay into groups for the purposes of payment. The DRG classification system divides possible diagnoses into more than 20 major body systems and subdivides them into almost 500 groups for the purpose of Medicare reimbursement. Factors used to determine the DRG payment amount include the diagnosis involved as well as the hospital

---

[8] Local Coverage Determination (LCD) Date of Service Criteria, *available at* https://www.cms.gov/medicare-coverage-database/search/lcd-date-search.aspx?DocID=L35093&bc=gAAAAAAAAAAA.

resources necessary to treat the condition.[9][10]

    ii.   International Classification of Diseases (ICD-9 and ICD-10) – Hospitals report diagnosis information using codes from the ICD-9-CM (the International Classification of Diseases, 9th Edition, Clinical Modification if the date of service is before October 1, 2015) or ICD-10 CM (if the date of service is on or after October 1, 2015).

    iii.   Inpatient medical procedures ICD-9 Volume 2 and Volume 3 and ICD-10 PCS – These codes are used to describe inpatient medical procedures, excluding the physician's bill.

    iv.   Current Procedural Terminology ("CPT") – CPT[11] codes are a standardized listing of descriptive terms and identifying codes for reporting outpatient medical services and procedures as well as both inpatient and outpatient physician services. The current version, CPT-4, is maintained by the American Medical Association and is an accepted standard by the National

---

[9] Gillian I. Russell, Terminology, in FUNDAMENTALS OF HEALTH LAW 1, 12 (American Health Lawyers Association 5th ed., 2011).

[10] Beginning in 2007, CMS overhauled the DRG system with the development of "severity-adjusted DRGs" and began to replace DRGs with "Medicare-severity DRGs" or "MS-DRGs" through a three-year phase-in period that blended payment under the old DRG system and the MS-DRG system. In a small number of MS-DRGs, classification is also based on the age, gender, and discharge status of the patient. The diagnosis and discharge information is reported by the hospital using codes from the ICD-9-CM or ICD-10-CM if the date of service is on or after October 1, 2015.

[11] CPT codes and descriptions are copyrights of the American Medical Association Current Procedural Terminology.

Committee on Vital Statistics or NCVHS.[12]

v.    Ambulatory Patient Classification (APC) – Services performed in outpatient ambulatory surgery centers may be classified by APCs. CMS assigns individual services to APCs based on similar clinical characteristics and similar costs.[13]

vi.   Healthcare Common Procedure Coding System (HCPCS) – HCPCS is mainly used to indicate medical supplies, durable medical goods, ambulance services, and durable medical equipment, prosthetics, orthotics and supplies (DMEPOS).[14]

vii.  Medical Data Code Sets – The standard Code set for medical diagnosis and procedure codes in health care claims is a series of digits as specified in 45 C.F.R. § 162.1002.

viii. The purpose of standard diagnosis code sets is to use a universal terminology in describing patients with certain conditions to determine compensable or non-compensable claims.

---

[12] National Committee on Vital and Health Statistics, Consolidated Health Informatics Initiative, *available at* http://www.ncvhs.hhs.gov/meeting-calendar/agenda-of-the-december-9-10-2003-ncvhs-subcommittee-on-standards-and-security-hearing/consolidated-health-informatics-initiative-final-recommendation-information-sheet-billingfinancial-for-the-december-9-2003-ncvhs-subcommittee-on-standards-and-security-hearing/.

[13] CMS, Hospital Outpatient Prospective Payment System, Partial Hospitalization services furnished by hospitals or Community Mental Health Centers, Ambulatory Payment System, https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/downloads/HospitalOutpaysysfctsht.pdf.

[14] American Academy of Professional Coders (AAPC), https://www.aapc.com/resources/medical-coding/hcpcs.aspx.

ix. CMS primarily utilizes two systems of classification: (1) International Classification of Diseases ("ICD-9" and "ICD-10") medical diagnosis codes; and (2) Current Procedural Terminology ("CPT-4") procedure codes. *See* 45 C.F.R. § 162.1002.