## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MSP RECOVERY CLAIMS, SERIES 44, LLC, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 22-cv-5054 |
| v. | ) ) | Hon. Steven C. Seeger |
| ZURICH AMERICAN INSURANCE COMPANY, | ) ) ) | |
| Defendant. | ) ) ) | |

### MEMORANDUM OPINION AND ORDER

Once you cut through the acrimonious history between the parties, and the intricate regulatory backdrop, this case boils down to one insurer's alleged failure to reimburse another. After a Medicare enrollee was injured in an accident, a private Medicare insurance carrier paid out Medicare benefits on the enrollee's behalf. Those payments should have been conditional. Another insurer, Defendant Zurich American Insurance Company, was contractually obligated to cover the enrollee's accident-related medical expenses.

But Zurich never paid the private carrier back. In fact, Zurich neglected to notify the carrier of its responsibility to pay in the first place. So the private carrier was stuck with more than its fair share of the bill. The private carrier never recouped its conditional payments, and it didn't even know who to ask for repayment.

That's where Plaintiff comes in. The Medicare insurance carrier assigned its rights to recover the unreimbursed payments, and those rights eventually landed in the hands of Plaintiff MSP Recovery Claims, Series 44, LLC. With those rights in hand, Plaintiff has now come to collect by filing suit against Zurich under the Medicare Secondary Payer Act.

The two-count complaint includes a claim for double damages under the statute for the payments on behalf of the injured beneficiary ("M.B."). The other claim is about beneficiaries (plural) generally. The second count seeks declaratory relief for Zurich's failure to reimburse the private carrier for payments made on behalf of many other unidentified beneficiaries.

Zurich responded with several motions, including a motion to dismiss the complaint for failure to state a claim and for lack of standing.

For the following reasons, the motion to dismiss is granted in part and denied in part.

**Background**

I. **Statutory and Regulatory Background**

Before digging into the facts of the case, the Court surveys the regulatory landscape. This lawsuit takes place within the statutory thicket that is the federal Medicare Act – a law "as unwieldy and complex as any statute in the U.S. Code." *See MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 994 F.3d 869, 873 (7th Cir. 2021). That is not a compliment.

Medicare, of course, is familiar to your average American. Medicare is the federal health insurance program for people 65 or older. *See MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 935 F.3d 573, 577 (7th Cir. 2019). Eligible individuals can receive Medicare benefits in several different ways.

Many receive Medicare benefits directly from the government through Medicare Parts A and B. *Id.*; *see also* 42 U.S.C. § 1395w-21(a). Medicare Parts A and B are the traditional fee-for-service provisions entitling eligible people to have the Centers for Medicare and Medicaid Services ("CMS"), which administers the program, directly pay medical providers for their hospital and outpatient care. *See Humana Med. Plan, Inc. v. W. Heritage Ins. Co.*, 832 F.3d 1229, 1233 (11th Cir. 2016).

Other eligible individuals receive Medicare benefits from private entities, known as Medicare Advantage Organizations ("MAOs"), under Part C of the Medicare Act. *See MAO-MSO Recovery II*, 935 F.3d at 577. Through this program, known as Medicare Advantage, an MAO (rather than CMS) provides Medicare benefits in exchange for a per capita reimbursement from the government for each Medicare enrollee it covers. *Id.*

That's the overarching architecture of Medicare. The question becomes who pays what when a beneficiary incurs expenses.

### A. The Medicare Secondary Payer Act

Oftentimes, more than one insurer is liable for an individual's medical costs. *See Humana*, 832 F.3d at 1233. Think of a car accident victim, who might be eligible to recover from both her tortfeasor's liability insurer, as well as her own Medicare insurer.

In those multi-insurer situations, the question becomes who pays. That's where two important pieces of Medicare vocabulary enter the picture: "primary" and "secondary" payers. The "primary" payer takes up the mantle of providing the first layer of insurance coverage. The "secondary" payer becomes liable only for costs not covered by the primary payer. *See MAO-MSO Recovery II*, 935 F.3d at 577–78. To use a baseball analogy, the primary payer acts as the catcher's mitt, with the secondary payer standing behind the plate as the backstop.

Before 1980, "Medicare acted as the primary payer for many medical services, even if a Medicare beneficiary was also covered under another insurance plan." *Aetna Life Ins. Co. v. Big Y Foods, Inc.*, 52 F.4th 66, 68 (11th Cir. 2022); *see also* Social Security Amendments of 1965, Pub. L. No. 89-97, § 1862(b), 79 Stat. 286, 325. That is, Medicare was *always* the catcher's mitt in the two-insurer scenario. "Medicare paid for all medical treatment within its scope and left private insurers merely to pick up whatever expenses remained." *Bio-Med. Applications of*

*Tenn., Inc. v. Cent. States Se. & Sw. Areas Health & Welfare Fund*, 656 F.3d 277, 278 (6th Cir. 2011).

But then Congress flipped the script, and Medicare changed roles. In the 1980s, Congress enacted a series of amendments – collectively referred to as the Medicare Secondary Payer Act ("MSP Act") – designed to "reduce Medicare costs by making the government a secondary provider of medical insurance coverage when a Medicare recipient has other sources of primary insurance coverage." *Brown v. Thompson*, 374 F.3d 254, 257 (4th Cir. 2004); *see also* 42 U.S.C. § 1395y *et seq.*

The MSP Act shifts responsibility for medical payments from Medicare plans to other health plans, such as no-fault and liability insurance. Those non-Medicare plans become "primary plans" under the Act. Medicare, in turn, is "statutorily barred from making payments for medical costs when an enrollee has benefited from or is likely to benefit from some other insurance or worker's compensation plan." *MAO-MSO Recovery II*, 935 F.3d at 577–78; *see also United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 874–75 (11th Cir. 2003) (recounting the history of the MSP Act). In these situations, "Medicare is a secondary form of coverage that applies only to costs not covered by the primary insurer." *MAO-MSO Recovery II*, 935 F.3d at 577–78; *Baxter Int'l*, 345 F.3d at 875.

An analogous provision in Medicare Part C covers the same ground for certain Medicare Advantage Organizations. That is, the MSP Act designates some MAOs as secondary payers when enrollees have some form of primary coverage. *See MAO-MSO Recovery II*, 935 F.3d at 578; *see also* 42 U.S.C. § 1395w-22(a)(4).

Under this arrangement, primary payers must pay for covered medical costs without taking into account whether a policy holder is also covered by a secondary payer (*i.e.*, Medicare

4

or an MAO). *See* 42 U.S.C. §§ 1395w-22(a)(4), 1395y(b)(1). The secondary payer, in turn, saves money because it must pay only the difference between costs covered under its plans and costs covered by primary payers. The Act thus "cuts Medicare spending by placing financial responsibility for medical costs with available primary plans first." *Illinois Ins. Guar. Fund v. Becerra*, 33 F.4th 916, 918 (7th Cir. 2022). There's a big difference between footing the entire bill, and paying what's left after the first payer does its part.

Despite their statutory obligations, primary payers don't always step up to the plate and pay, or at least they don't always pay promptly. For example, for Medicare beneficiaries in traffic accidents, prolonged disputes about liability may delay payments by the tortfeasor's insurer.

To avoid leaving Medicare beneficiaries out in the cold in such cases, Congress authorized Medicare insurers to make immediate payments for care. *Id.* at 920. The MSP Act empowers Medicare or an MAO to make "conditional" payments on behalf of a Medicare beneficiary, subject to reimbursement from the primary payer. *See* 42 U.S.C. §§ 1395y(b)(2)(B)(i)–(ii), 1394w-22(a)(4).

But those conditional payments don't change the Medicare insurer's role as a secondary payer. If Medicare or an MAO pays for services that were, or should have been, covered by a primary insurer, the Act entitles them to recoup reimbursement from the primary payer. *See id.* §§ 1395y(b)(2)(B)(i)–(ii), 1394w-22(a)(4); *see also Baxter Int'l*, 345 F.3d at 875.

To increase the chances of receiving reimbursement from primary payers, Congress created two mechanisms for enforcement. One such mechanism is a government cause of action to recover unreimbursed conditional payments from a primary payer. *Id.* § 1395y(b)(2)(B)(iii).

The second, entitled "Enforcement," creates a private cause of action that permits some private plaintiffs to sue the primary payer for double damages. *See id.* § 1395y(b)(3)(A).

## II.     Allegations in the Complaint

With that regulatory backdrop in mind, the Court turns to the allegations of the complaint. At the motion-to-dismiss stage, the Court must accept as true the complaint's well-pleaded allegations. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

Plaintiff MSP Recovery Claims Series 44, LLC is not a Medicare Advantage Organization. Rather, it asserts that it is an assignee of claims that belonged to a particular Medicare Advantage Organization named Health First Health Plans ("HFHP").[1] *See* Cplt., at ¶¶ 12, 27 (Dckt. No. 1). The thrust of the lawsuit is that Defendant Zurich American Insurance Company, an Illinois-based insurer, is a primary payer that failed to reimburse HFHP's conditional payments on behalf of Medicare beneficiaries. *Id.* at ¶¶ 20, 39–55.

Plaintiff alleges that Zurich issued liability and no-fault insurance policies to tortfeasors who wound up injuring Medicare enrollees covered by HFHP. *Id.* at ¶¶ 20, 36. After the injuries occurred, Zurich allegedly entered into settlement agreements on behalf of its insureds with the injured Medicare beneficiaries to pay their medical costs. *Id.* at ¶¶ 36–38. Those settlements catapulted Zurich into a "primary payer" role for purposes of the MSP Act, meaning that it now had reimbursement obligations. *Id.*

---

[1] The Court untangled the Gordian Knots of the assignment chain and Plaintiff's corporate identity in a separate Order. *See* 8/15/23 Mem. Opin. & Order (Dckt. No. 46). In an act of mercy to the reader, the Court incorporates that discussion by reference here.

In the meantime, HFHP covered their beneficiaries' medical expenses. *Id.* at ¶ 43. But despite its primary payer status, Zurich never told HFHP that it was the primary payer, and it never reimbursed HFHP for those conditional payments. *Id.* at ¶¶ 36–38. Plaintiff, as the assignee to HFHP's claims, now invokes the MSP Act's private cause of action to recover double damages for those unreimbursed payments. *Id.* at ¶ 67; *see also* 42 U.S.C. § 1395y(b)(3)(A).

The complaint includes a single "settlement representative beneficiary." That is, the complaint identifies a single instance, involving one Medicare beneficiary, when Zurich allegedly failed to reimburse HFHP's conditional payments. *See* Cplt., at ¶¶ 39–55 (Dckt. No. 1). The exemplar beneficiary, identified as "M.B.," was enrolled in a Medicare Advantage Plan issued by HFHP. *Id.* at ¶ 39. M.B. was injured in an accident while enrolled on the plan, and sustained injuries requiring medical services. *Id.* at ¶ 40.

M.B.'s medical costs and expenses were covered under a no-fault insurance policy issued by Defendant Zurich. *Id.* at ¶¶ 41, 44. Zurich was therefore a primary payer, and was obligated to provide primary coverage and pay for M.B.'s accident-related medical expenses. *Id.*

But as it turned out, HFHP, not Zurich, paid the initial costs of M.B.'s medical expenses. Medical providers billed and charged HFHP $18,556.95 for M.B.'s accident-related medical expenses, and HFHP paid $1,170.39 of that amount. *Id.* at ¶ 43.

Meanwhile, Zurich reported to the Centers for Medicare and Medicaid Services (again, "CMS") that it was the primary payer for M.B.'s medical costs. *Id.* at ¶¶ 45–47. But it never reimbursed HFHP. *Id.* at ¶ 47. And it never notified HFHP of its primary payer responsibility. *Id.* at ¶ 48. So HFHP paid part of the bill for M.B.'s medical expenses, and it had no idea who to ask for reimbursement.

That's a summary of the complaint's allegations about the payments on behalf of M.B. But the complaint also makes vague reference to other, unidentified beneficiaries. Plaintiff alleges that Zurich failed to reimburse HFHP, or provide notice of Zurich's primary payer status, with respect to payments that HFHP made on behalf of multiple beneficiaries. *Id.* at ¶ 38.

So, the complaint seeks to recover on behalf of many more beneficiaries than simply M.B. Plaintiff hopes to recover for all claims "HFHP assigned to [Series] 44," for which M.B. is only a "representative beneficiary." *Id.* at ¶ 33; *id.* at p. 13.

In Plaintiff's view, M.B.'s claim is just the tip of the iceberg, which Plaintiff includes in the complaint "solely for the purpose of demonstrating standing" and "to obtain the discovery MSPRC 44 needs." *Id.* at ¶ 26. The "bulk of [HFHP's unreimbursed] payments remain hidden without discovery." *Id.* at ¶ 25. So, Plaintiff seeks additional discovery – in particular, the "lists of no-fault and third-party claims that [Zurich] settled" – in order to uncover the full extent of Zurich's wrongdoing. *Id.* at ¶ 26.

The complaint includes two counts based on Zurich's alleged failure to reimburse HFHP for its conditional payments on behalf of an unknown number of beneficiaries. Count One alleges a violation of the Medicare Secondary Payer Act, 42 U.S.C. § 1395y(B)(3)(A). *Id.* at ¶¶ 58–67.

Count Two seeks declaratory relief under 28 U.S.C. § 2201. Specifically, Plaintiff asks for a declaratory judgment establishing that Zurich has a duty to reimburse HFHP for payments made for medical expenses on behalf of who-knows-how-many unidentified beneficiaries, as well as an equitable accounting of the amounts that Zurich owed HFHP (before reassignment). *Id.* at ¶¶ 68–85.

### III.     Procedural Background

Zurich responded to the complaint with three motions.

First, Zurich moved to stay discovery pending the Court's ruling on its motion to dismiss. *See* Def.'s Mtn. to Stay Discovery (Dckt. No. 21). The Court granted that motion on May 3, 2023. *See* 5/3/23 Order (Dckt. No. 34).

Second, Zurich asked the Court to exercise its authority under Rule 41(d) and stay the case until Plaintiff paid Zurich the costs that it expended defending two earlier cases brought by a similar plaintiff in Florida. *See* Def.'s Mtn. for Rule 41(d) Costs and Stay of Proceedings (Dckt. No. 17). The Court today denies that motion by separate Order.

Third, Zurich moved to dismiss the complaint for lack of standing and for failure to state a claim. *See* Def.'s Mtn. to Dismiss (Dckt. No. 19). That motion is the subject of this Order.

### Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a Rule 12(b)(6) motion, the complaint must provide the defendant with fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## Analysis

Zurich moves to dismiss the complaint for lack of subject matter jurisdiction under Rule 12(b)(1), and for failure to state a claim upon which relief can be granted under Rule 12(b)(6). *See* Def.'s Mtn. to Dismiss (Dckt. No. 19). Additionally, Zurich moves to dismiss the complaint on the ground that it violates a previous order of a court in this district. *See* Def.'s Mem. in Supp. of Mtn. to Dismiss, at 6–7 (Dckt. No. 20) ("Def.'s Mem.").

### I.    Statutory Standing

The Court begins with Zurich's standing arguments. Zurich argues that Plaintiff lacks standing to bring this lawsuit, for two reasons. First, Zurich asserts that the Medicare Secondary Payer Act's private cause of action does not give Plaintiff – the assignee of a Medicare Advantage Organization – a federal right of action. *See* Def.'s Mem., at 8 (Dckt. No. 20). Second, Zurich contends that the Act imposes a pre-suit notice requirement, and that Plaintiff failed to meet it. *Id.* at 9. The Court takes each argument in turn.

Before the Court gets going, however, one clarification is worth noting. Zurich's standing arguments do not, in fact, implicate this Court's jurisdiction. Zurich's arguments do not raise Rule 12(b)(1) issues. They raise Rule 12(b)(6) issues.

Beginning with the cause-of-action argument, Zurich frames the issue as one of "standing" in the Article III sense, but that's not exactly right. *See* Def.'s Mtn. to Dismiss (Dckt. No. 19) (invoking Rule 12(b)(1) of the Federal Rules of Civil Procedure). "Plaintiffs have [Article III] standing if they have been injured, the defendants caused that injury, and the injury can be redressed by a judicial decision." *Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 536 (7th Cir. 2011) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102–04 (1998)). None of those three constitutional requirements is in question here.

Zurich does not argue that Plaintiff fails to satisfy any of the requirements for standing in the constitutional sense. That is, Zurich is not asserting that Plaintiff has not suffered an injury in fact that is fairly traceable to the actions of Defendant and that is likely to be redressed by a favorable judicial decision. *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Rather, Zurich argues that the Medicare Secondary Payer Act does not provide Plaintiff's assignor, a Medicare Advantage Organization, with a cause of action. That's a question of statutory standing, not Article III standing.

Statutory standing asks "whether the statute grants the plaintiff the cause of action that he asserts." *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 196–97 (2017); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127, 128 n.4 (2014). A plaintiff has statutory standing only when his or her interests "fall within the zone of interests protected by the law invoked." *Lexmark*, 572 U.S. at 126 (internal quotation marks omitted). That inquiry, in turn, requires the court "to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Bank of Am.*, 581 U.S. at 197.

Despite its similar name, statutory standing is a whole different ballgame from Article III standing. When a plaintiff does not have Article III standing, the court lacks subject matter jurisdiction to hear its claims. *See Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017). Statutory standing, in contrast, does not implicate a court's subject matter jurisdiction but is better understood as a Rule 12(b)(6) issue. *See Lexmark*, 572 U.S. at 128 n.4; *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,* 535 U.S. 635, 642–43 (2002) ("It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.,* the courts' statutory or constitutional *power* to adjudicate the case.")

11

(emphasis in original); *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 97 (1998) ("[A]n issue of statutory standing . . . has nothing to do with whether there is case or controversy under Article III.") (emphasis omitted); *In re Fluidmaster, Inc.*, 149 F. Supp. 3d 940, 951 (N.D. Ill. 2016). So, the Court will consider the motion under the standards of Rule 12(b)(6), not Rule 12(b)(1).

The same goes for Zurich's pre-suit notice argument, which Zurich likewise couches in terms of "standing." *See* Def.'s Mem., at 12 (Dckt. No. 20). Whether a plaintiff has satisfied the notice requirements of a Medicare Secondary Payer Act claim has "nothing to do with [the] plaintiff's standing to sue under Article III of the U.S. Constitution (which requires only but-for causation, an injury-in-fact, and redressability)." *See Supreme Auto Transp., LLC v. Arcelor Mittal USA, Inc.*, 902 F.3d 735, 743 (7th Cir. 2018) (describing the difference between a cause-of-action inquiry and an Article III standing inquiry in the antitrust context); *see also Haith ex rel. Accretive Health, Inc. v. Bronfman*, 928 F. Supp. 2d 964, 973 (N.D. Ill. 2013) (holding that a failure to allege demand futility was not a question of Article III standing). So, like the last argument, Zurich's pre-suit notice argument raises a Rule 12(b)(6) issue, not a Rule 12(b)(1) issue.

With the proper standard in mind, the Court turns to the merits of Zurich's arguments.

A.      **The Medicare Secondary Payer Act's Private Cause of Action**

The first argument is that Plaintiff lacks standing because the Medicare Secondary Payer Act does not provide a private cause of action to Medicare Advantage Organizations. *Id.* at 8–9. The Court does not dwell long here because courts roundly agree that the MSP Act's private cause of action is available to MAOs, and by extension their assignees.

The Medicare Secondary Payer Act includes a provision that expressly creates a private right of action. The statute provides:

> There is established a private cause of action for damages (which shall be in an amount double the amount otherwise provided) in the case of a primary plan which fails to provide for primary payment (or appropriate reimbursement) in accordance with paragraphs (1) and (2)(A).

*See* 42 U.S.C. § 1395y(b)(3)(A).

While the Seventh Circuit has not addressed the question, the Second, Third, and Eleventh Circuits – the only circuit courts to have done so – are all in agreement. Subsection (3)(A)'s "broad and open-ended" provision "provides no limitation on which private actors may sue a primary plan that fails to provide reimbursement." *See Aetna Life Ins. Co. v. Big Y Foods, Inc.*, 52 F.4th 66, 73 (2d Cir. 2022); *see also Humana Med. Plan, Inc. v. W. Heritage Ins. Co.*, 832 F.3d 1229, 1238 (11th Cir. 2016) ("Neither the MSP [Act] nor our case law places any other restriction on the class of plaintiffs to whom the MSP private cause of action is available."); *In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, 685 F.3d 353, 365 (3d Cir. 2012) ("The plain text of the MSP private cause of action lends itself to [plaintiff's] position that any private party may bring an action under that provision."). The text has wide boundaries, without placing any particular type of plaintiff off-limits.

In light of the breadth of the text, each Court of Appeals has held that subsection (3)(A) permits a Medicare Advantage Organization to sue a primary plan that fails to reimburse its secondary conditional payment. *See Big Y Foods, Inc.*, 52 F.4th at 73 ("[T]here is no basis to exclude MAOs from a broadly worded provision that enables a plaintiff to vindicate harm caused by a primary plan's failure to meet its MSP primary payment or reimbursement obligations.") (quotation marks omitted); *Humana Med. Plan*, 832 F.3d at 1238 ("We conclude that paragraph (3)(A), the MSP private cause of action, permits an MAO to sue a primary plan that fails to

13

reimburse an MAO's secondary payment."); *In re Avandia Mktg.*, 685 F.3d at 365 ("MAOs are not excluded from bringing suit under the MSP private cause of action.").

District courts around the country, including in this circuit, have followed suit. *See, e.g.*, *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 2018 WL 2392827, at *3 (C.D. Ill. 2018) (collecting cases).

The same rule applies to *assignees* of Medicare Advantage Organizations. Courts regularly permit an MAO's assignees to sue primary payers under subsection (3)(A) for their failure to make appropriate and timely reimbursement of the MAO's conditional payments. *See, e.g.*, *MSP Recovery Claims Series 44, LLC v. Bunker Hill Ins. Co.*, 2023 WL 4744739, at *4 (D. Mass. 2023) ("[T]his Court is satisfied that Medicare Advantage Organizations have standing, that MSPRC 44 is a proper party to bring suit, that the [exemplar claim] is assignable, and that the complaint demonstrated enough facts to support that the [exemplar] claim was assigned.") (citations omitted); *MSP Recovery Claims, Series LLC v. Auto-Owners Ins. Co.*, 342 F.R.D. 347, 352 (S.D. Fla. 2022) (holding that an "MAO or downstream entity" suffering unreimbursed conditional payments may bring a claim under subsection (3)(A)).

Zurich cites no contrary case law. Zurich also concedes that every circuit court to take up the issue has concluded that the MSP Act provides a cause of action to Medicare Advantage Organizations. *See* Def.'s Reply, at 5 (Dckt. No. 32) ("Zurich acknowledges those decisions."). Instead, it asks this Court to depart from that consensus and adopt a novel statutory interpretation. *Id.* (arguing "that the plain text . . . demonstrates that Congress did not grant standing under the MSP Act," and citing *Humana Med Plan, Inc. v. W. Heritage Ins. Co.*, 880 F.3d 1284, 1290 (mem.) (11th Cir. 2018) (Tjoflat, J., dissenting)).

14

The Court declines that invitation.  Absent any authority to the contrary, this Court "finds no reason to depart from the national trend interpreting subsection (3)(A) to permit MAOs to bring private causes of action."  *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 2018 WL 340021, at *2 (C.D. Ill. 2018).  MAOs can sue if they suffer an injury within the meaning of the Act.  And if MAOs have a right to sue, then MAOs can sell and assign that right to sue, unless a statute says that they can't.

The Court concludes that a Medicare Advantage Organization may maintain an action under the MSP Act's private cause of action.  *See* 42 U.S.C. § 1395y(b)(3)(A).  And MSP Recovery Claims, Series 44, LLC, as the assignee of an MAO, may bring this case.  *See Perry v. Globe Auto Recycling, Inc.*, 227 F.3d 950, 953 (7th Cir. 2000) ("[T]he assignee stands in the shoes of the assignor and assumes the same rights, title and interest possessed by the assignor.") (quotation marks omitted).

### B.       Pre-Suit Notice Requirement

Next, Zurich argues that Plaintiff lacks standing because it failed to meet supposed pre-suit notice requirements imposed by the Medicare Secondary Payer Act.  *See* Def.'s Mem., at 9 (Dckt. No. 20).  That argument fails because it relies on notice requirements that do not exist.  And to the extent that the Act requires primary payers to have prior knowledge that they owe primary payment, Plaintiff has satisfactorily pled such knowledge on the part of Zurich.

Zurich contends that the MSP Act requires a plaintiff to send a notice letter to a prospective defendant before it can file suit.  *Id.* at 10 ("In drafting the MSP Act, Congress intended a pre-suit notification letter be sent to the suspected primary payer to permit parties to confer about the reimbursement of specific claims prior to resorting to the courts.").  According to Zurich, proper pre-suit notification required Plaintiff to "provide notice of the specific

situation, list the amounts being claimed, include an explanation of how those medical services are related to the accident for which the primary payer is responsible, and demand reimbursement of the amounts the Medicare Advantage provider paid." *Id.*

Plaintiff apparently failed to send any such letter with respect to M.B.'s claim. So, Zurich argues that Plaintiff lacks standing. *Id.* at 12.

Zurich finds evidence of the MSP Act's supposed pre-suit notice requirement in two places. First, Zurich points to a federal regulation, 42 C.F.R. § 411.25. But a close look at that regulation shows that it imposes notice obligations on *Zurich*, not Plaintiff.

Section 411.25 is titled the "Primary payer's notice of primary payment responsibility." *See* 42 C.F.R. § 411.25. The regulation states:

> (a) If it is demonstrated to a primary payer that CMS has made a Medicare primary payment for services for which the primary payer has made or should have made primary payment, it must provide notice about primary payment responsibility and information about the underlying MSP situation to the entity or entities designated by CMS to receive and process that information.
>
> (b) The notice must describe the specific situation and the circumstances (including the particular type of insurance coverage as specified in § 411.20(a)) and, if appropriate, the time period during which the insurer is primary to Medicare.
>
> (c) The primary payer must provide additional information to the designated entity or entities as the designated entity or entities may require this information to update CMS' system of records.

*Id.*

Take a close look at the phrasing in the first subsection. "If it is demonstrated to a primary payer that CMS has made a Medicare primary payment for services for which the primary payer has made or should have made primary payment, *it* must provide notice about primary payment responsibility and information about the underlying MSP situation to the entity

16

or entities designated by CMS to receive and process that information." *See* 42 C.F.R. § 411.25(a) (emphasis added).

The regulation provides that "it" must provide notice. That phrasing begs a question: "it" *who*? "It" probably won't win any awards for crystal clarity. If you wanted to pick a word that left no room for doubt, "it" wouldn't be it.

That said, context clues and a little textual detective work reveal who is the antecedent of "it." The language doesn't leave room for a lot of suspects. The cast of characters in the sentence is remarkably slim. "It" could mean a "primary payer." Or it could mean "CMS." That's it. The text includes no other characters in the lineup.

So "it" must refer to either a "primary payer," or "CMS." And reading the text so that "it" refers to CMS would make little sense. After all, the sentence begins with the primary payer learning something: "If it is demonstrated to a primary payer that CMS has made a Medicare primary payment," then "it" must provide notice to an entity designated by CMS.

The text contemplates that the primary payer will learn something. So it makes sense that the primary payer has to share what it has learned. It is hard to see how CMS could notify someone of something that the "primary payer" has learned, because it is no sure thing that CMS will know what the primary payer knows.

By its terms, section 411.25 places the burden on the *primary* payer to provide notice to the secondary payer, not the other way around. When a primary payer becomes aware that "CMS has made a Medicare payment for services for which the primary payer has made or should have made primary payment, *it* must provide notice . . . to the entity or entities designated by CMS to receive and process that information." *Id.* (emphasis added).

17

The "it" who "must provide notice" refers to the primary payer, meaning Zurich. *See* Medicare Program; Medicare Secondary Payer (MSP) Amendments, 73 Fed. Reg. 9679, 9683 (Feb. 22, 2008) ("Section 411.25(a) requires *a primary payer* to provide information about primary payment responsibility . . . to the entity or entities designated by CMS to receive the information.") (emphasis added). So, in arguing that the regulation applies to a plaintiff making a claim under the Medicare Secondary Payment Act, Zurich stands the text on its head. To the extent that section 411.25 imposes specific notification requirements, those requirements fall squarely on the shoulders of Zurich.

Second, Zurich divines an implied pre-suit notice requirement from courts' interpretations of the MSP Act's private right of action provision, 42 U.S.C. § 1395y(b)(3)(A). *See* Def.'s Mem., at 9–10 (Dckt. No. 20). But courts (and the MSP Act) say no such thing.

Once again, the MSP Act's private cause of action provision states:

> There is established a private cause of action for damages (which shall be in an amount double the amount otherwise provided) in the case of a primary plan which fails to provide for primary payment (or appropriate reimbursement) in accordance with paragraphs (1) and (2)(A).

*See* 42 U.S.C. § 1395y(b)(3)(A). By its plain terms, the Act does not impose any sort of notice requirement on would-be plaintiffs. There is no reference to notice, or to any obligation on the part of a plaintiff.

Nonetheless, Zurich points out that courts have found that the Act permits a private right of action "against a primary plan that has *wrongfully* denied them payment," or against "a primary insurer [that] should have, but *refused to pay*." *See* Def.'s Mem., at 10 (Dckt. No. 20) (emphases added) (first quoting *Mason v. Am. Tobacco Co.*, 346 F.3d 36, 38 (2d Cir. 2003); and then quoting *Bio-Med Applications of Ga., Inc. v. City of Dalton*, 685 F. Supp. 2d 1321, 1332

(N.D. Ga. 2009)). According to Zurich "[t]he phrases 'wrongly denied' and 'refused to pay' imply that the primary payer was either given the opportunity to pay, or was, at least, on notice of to whom and how much it was required to pay." *Id.*

Defendant's argument overreads the courts' language in those cases. At best, that dicta implies that a primary payer must know of its primary payer status. And sure enough, courts have held that "primary payers must have knowledge that they owed a primary payment before a party can claim double damages under the Medicare Secondary Payer Act."[2] *MSP Recovery Claims, Series LLC v. ACE Am. Ins. Co.*, 974 F.3d 1305, 1319 (11th Cir. 2020) (citing *Glover v. Liggett Grp., Inc.*, 459 F.3d 1304, 1309 (11th Cir. 2006); 42 C.F.R. § 411.24(i)(2)).

But to say that a knowledge requirement is the same thing as a pre-suit demand obligation reads between the lines, to a fault. The phrases "wrongly denied" and "refused to pay" do not appear in the text of the statute, which is controlling. And they say nothing about

---

[2] On that front, Plaintiff has plausibly pled that Zurich had knowledge that it owed a primary payment. *See* Cplt., at ¶ 48 (Dckt. No. 1). For starters, Plaintiff alleges that Zurich reported M.B.'s accident to CMS and admitted its primary payer status. *Id.* at ¶ 56; *see also* 42 U.S.C. § 1395y(b)(8)(C). Plaintiff also alleges that it contacted Zurich to collect amounts owed for M.B.'s claim, and that Zurich acknowledged that it "has a record of a claim involving M.B." *See* Cplt., at ¶ 49. These allegations are sufficient at the pleading stage because they plausibly suggest that Zurich understood that it owed primary payments on M.B.'s claim. *See ACE Am. Ins. Co.*, 974 F.3d at 1319 (holding that plaintiffs' allegations that defendants filed with HHS "evidence[d] [d]efendants' knowledge that they owed primary payments, including the primary payments for which Plaintiffs seek reimbursement"); *MSP Recovery Claims, Series LLC v. Metro. Gen. Ins. Co.*, 40 F.4th 1295, 1304 (11th Cir. 2022) ("As to the knowledge requirement, a defendant's CMS filings evidence constructive knowledge that the defendant owed primary payments."). Zurich counters by attaching the parties' pre-suit correspondence – a Civil Remedy Notice that Plaintiff filed with the Florida Department of Financial Services. Zurich asserts that the Notice "shows that MSP Recovery knows Zurich is not the insurer for M.B.'s tortfeasor," and that "there has not been any proper pre-suit demand regarding M.B." *See* Def.'s Reply, at 7 (Dckt. No. 32); Civil Remedy Notice (Dckt. No. 32-1). While the Court may properly consider that document, *see Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1248 (7th Cir. 1994), it does not move the needle for Zurich. The Notice shows only that Zurich *thinks* that it is not the insurer for M.B.'s tortfeasor. Zurich may deny that it is the insurer, but at this stage of the game, the Court must accept Plaintiff's version of events. *See AnchorBank*, 649 F.3d at 614.

*how* a primary payer must come to know of its reimbursement obligations, or about whether the plaintiff is the one responsible for making those obligations known.

For that reason, courts routinely reject attempts to impose specific pre-suit notice requirements on MSP Act plaintiffs. *See ACE Am. Ins. Co.*, 974 F.3d at 1319 (noting that defendants "point[ed] to no law that obligated Plaintiffs to submit 'demand recovery letters' or otherwise provide advance notice of their intent to bring a claim" and holding that the regulation defendants cited imposed no such requirement); *MSP Recovery Claims, Series LLC v. Grange Ins. Co.*, 2019 WL 6770729, at *17 (N.D. Ohio 2019) (finding that plaintiff is not required to "allege detailed facts that, prior to making conditional payments, [the MAO] identified and coordinated benefits with primary payers" at the pleading stage); *MSP Recovery Claims, Series LLC v. Progressive Corp.*, 2019 WL 5448356, at *14 (N.D. Ohio 2019) ("[T]he Court's review of the . . . statute and the [regulations] cited by Defendants reveal no requirement that Medicare or an MAO first present the claim to the primary plan."); *Porter v. Farmers Ins. Co.*, 2012 WL 256014, at *19 (N.D. Okla. 2012), *aff'd*, 505 F. App'x 787 (10th Cir. 2012) ("Medicare's reimbursement rights are automatic, and it is not required to give notice of its claim.").

This Court agrees. The text of the private cause of action does not impose an obligation on an MSP Act plaintiff to first notify the primary payer of its claim. The regulation cited by Zurich doesn't, either. Absent any clear authority to the contrary, the Court finds that Plaintiff was not required to submit a pre-suit notification letter to Zurich.

## II.    Issue Preclusion:  Judge Gettleman's Earlier Dismissal in *Zurich III*

Zurich next argues that the Court should dismiss the complaint because it allegedly runs afoul of an order issued by another judge in this district when dismissing an earlier case. *Id.* Essentially, Zurich contends that issue preclusion bars the claims. The Court disagrees.

Before getting to that earlier case, the Court begins with a brief procedural recap.[3]  The Cliffs Notes version is that various MSP Recovery entities and Zurich have sparred in federal courthouses many times before.  In fact, this is the fourth lawsuit that an MSP Recovery entity has filed against Zurich.  *See MSP Recovery Claims, Series LLC v. Zurich Am. Ins. Co.*, 1:17-cv-24013 (S.D. Fla. 2017); *MSP Recovery Claims, Series LLC v. Zurich Am. Ins. Co.*, 1:17-cv-24015 (S.D. Fla. 2017); *MSP Recovery Claims, Series LLC v. Zurich Am. Ins. Co.*, 18-cv-7849 (N.D. Ill. 2018).  The first two suits were filed in Florida, and the third suit was filed in the Northern District of Illinois before Judge Gettleman.

The third and most recent case – the Court will refer to it as "*Zurich III*" – sits at the center of Zurich's argument.  The plaintiffs filed that purported class-action lawsuit in this district in 2018.  *See MSP Recovery Claims, Series LLC v. Zurich Am. Ins. Co.*, 18-cv-7849 (N.D. Ill. 2018) (Gettleman, J.).

In many respects, *Zurich III* resembled the lawsuit here.  MSP Recovery Claims, Series LLC (a *different* plaintiff than the plaintiff here) and one of its series alleged that they were assignees of legal claims held by various Medicare Advantage Organizations.  *See MSP Recovery Claims, Series LLC v. Zurich Am. Ins. Co.*, 2019 WL 6893007, at *1 (N.D. Ill. 2019).  There, as here, plaintiffs sued Zurich under the MSP Act for reimbursement of medical expenses that Medicare Advantage Organizations paid on behalf of Medicare beneficiaries.  *Id.*

Specifically, plaintiffs alleged that they held assignments from two Medicare Advantage Organizations, Health Insurance Plan of Greater New York ("HIP") and Network Health Insurance Corporation ("NHIC"), to pursue seven "exemplar" claims from Medicare enrollees.  *Id.* at *2.  According to plaintiffs, each exemplar individual was injured in an accident.  The

---

[3]  The Court discusses the lengthy litigious history between the parties (or their related corporate entities) in its ruling on Defendant's Rule 41(d) motion.  *See* 8/15/23 Mem. Opin. & Order (Dckt. No. 46).

Medicare Advantage Organizations made conditional payments on behalf of each injured beneficiary, and the Medicare Advantage Organizations then assigned their reimbursement claims to plaintiffs. *Id.*

The case didn't make it very far from the starting line. Judge Gettleman dismissed *Zurich III* for lack of jurisdiction, finding that plaintiffs did not have standing to bring the exemplar claims that they alleged in the complaint. *Id.* at *3.

Plaintiffs' allegations fell short in two respects. First, Judge Gettleman found that the alleged assignment from one of the Medicare Advantage Organizations, HIP, did not include the named exemplar claims. *Id.* at *2 ("The assignment documents contain no list of which claims were assigned to [plaintiffs] and which were excluded.").

Second, Judge Gettleman found that, for the named exemplar claim assigned by NHIC, Zurich was not the insurer. *Id.* That exemplar's medical expenses were covered under a policy issued by another insurer. *Id.* In other words, Zurich was not the primary payer within the meaning of the Medicare Secondary Payer Act. "Thus, plaintiffs [had] named the wrong defendant." *Id.*

Judge Gettleman dismissed the complaint without leave to amend. *Id.* at *3. Plaintiffs had already amended their complaint twice in that case, and Judge Gettleman went on to observe that "the instant complaint is not plaintiffs' third attempt to establish standing and a claim, but actually their ninth." *Id.* Remember that another member of the MSP Recovery corporate family filed two similar lawsuits in Florida, and amended their complaints multiple times in each. Against that backdrop, Judge Gettleman concluded that "[n]ine attempts to establish standing and plead a cause of action is enough." *Id.* Plaintiffs had shot their last shot.

Zurich argues that Judge Gettleman's dismissal without prejudice precludes the instant complaint. Judge Gettleman dismissed *Zurich III* without leave to amend, meaning that that particular plaintiff (MSP Recovery Claim, Series LLC) could not have filed another amended complaint in that case. According to Zurich, "[i]t is equally impermissible for MSP Recovery to wait a few years and bring a new lawsuit with this old M.B. claim to circumvent Judge Gettleman's order." *See* Def.'s Mem., at 7 (Dckt. No. 20).

When a court dismisses a case for lack of jurisdiction, the preclusive effects are limited. "[A] jurisdictional dismissal precludes only the relitigation of the ground of that dismissal." *Okoro v. Bohman*, 164 F.3d 1059, 1063 (7th Cir. 1999). In other words, when a court dismisses a case for lack of jurisdiction, that dismissal "precludes relitigation of the issue actually decided, namely the jurisdictional issue." *Perry v. Sheahan*, 222 F.3d 309, 318 (7th Cir. 2000).

A plaintiff whose case is dismissed for lack of standing, without leave to amend, may later "file a new lawsuit against the defendant[] if it wishes to properly allege standing and assert claims for relief." *White v. Illinois State Police*, 15 F.4th 801, 808 (7th Cir. 2021). "If plaintiffs . . . later believe they can demonstrate that they have suffered an injury in fact after all . . . they can present these claims against the same defendant in a new federal suit." *MAO-MSO Recovery II*, 935 F.3d at 582.

Plaintiff has done just that. Although the instant complaint raises familiar legal claims, Plaintiff brings new factual allegations to the table. The M.B. claim enters the picture for the first time. So too does the HFHP assignment. And according to Plaintiff, that claim and that assignment confer standing.

Zurich argues that these new factual allegations do not escape the preclusive effect of Judge Gettleman's ruling because they were known to MSP Recovery when it filed *Zurich III*.

23

*See* Def.'s Mem., at 6–7 (Dckt. No. 20). MSP Recovery filed its complaint in *Zurich III* in November 2018. *See Zurich III*, No. 18-cv-7849 (N.D. Ill. 2018) (Dckt. No. 1). The assignment from HFHP dated back to 2016, and M.B.'s claim arose after his accident in June 2018. *See* Cplt., at ¶¶ 27, 39 (Dckt. No. 1). Thus, "MSP Recovery already held the assignment to the M.B. claim when MSP/Zurich III was dismissed." Def.'s Reply, at 3 (Dckt. No. 32).

As Zurich sees it, only *new* facts arising *after* MSP Recovery filed *Zurich III* can circumvent issue preclusion. *See* Def.'s Mem., at 6–7 (Dckt. No. 20); *see also Perry*, 222 F.3d at 318 ("[W]here a prior suit is dismissed for lack of jurisdiction, the inclusion of additional factual allegations on the jurisdictional issue will not avoid issue preclusion when those facts were available at the time the original complaint was filed."); 18 James W. Moore *et al.*, Moore's Federal Practice, at § 132.03[5][c] (3d ed. 2021) ("[A] jurisdictional dismissal may be relitigated if events occurring subsequent to the dismissal have remedied the original jurisdictional deficiency."). So, since "M.B. is not a claim that MSP acquired from HFHP *after* MSP/Zurich III was dismissed," Judge Gettleman's dismissal without leave to amend precludes the claim. *See* Def.'s Reply, at 3 (Dckt. No. 32) (emphasis added).

But Zurich overreads the scope of the issues precluded. The Seventh Circuit has noted that a plaintiff can avoid the preclusive effect of a jurisdictional dismissal in an MSP Act case by alleging a "*different* assignment or exemplar claim . . . in a new federal suit." *See MAO-MSO Recovery II*, 935 F.3d at 582 (emphasis in original); *see also MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 2019 WL 4452833, at *4 (C.D. Ill. 2019), *aff'd*, 994 F.3d 869 (7th Cir. 2021) ("There may be plenty more exemplars in the sea, as it were, but claims related to them will need to be pursued through a different suit . . . ."). So, while Judge Gettleman's

dismissal may have precluded new allegations about the exemplars and assignments raised in *that* case, Plaintiff was entitled to introduce a new cast of characters in the instant lawsuit.

In *MAO-MSO Recovery II*, the plaintiffs (which included one of the plaintiffs in *Zurich III*) were a group of assignees of claims that originally belonged to Medicare Advantage Organizations. *See MAO-MSO Recovery II*, 935 F.3d at 576–77. They brought a putative class action against the defendant to recover payments that the defendant allegedly should have made to them as reimbursement for certain medical costs. *Id.* at 577.

As in *Zurich III*, the district court held that plaintiffs lacked Article III standing. *Id.* at 578. There were assignment problems. "[T]he district court found that [plaintiffs] did not have valid assignments from any Medicare Advantage Organization that made unreimbursed payments." *Id.* at 579.

Absent a valid assignment, "plaintiffs had no injury for which they could seek redress." *Id.* That left plaintiffs without standing, because no injury means no standing. So the district court dismissed the case with prejudice. *Id.* at 578.

On appeal, plaintiffs argued that dismissal "with prejudice" was error. *Id.* at 577. The Seventh Circuit agreed. The Court of Appeals noted that a jurisdictional dismissal and a dismissal with prejudice were mutually exclusive. *Id.* at 581. "If a complaint fails to include enough allegations to support Article III standing for the plaintiffs, the court has only two options: it can either dismiss the complaint with leave to amend, or it can dismiss the case for want of jurisdiction and hence without prejudice." *Id.* So, the Seventh Circuit construed the district court's dismissal as a jurisdictional dismissal, meaning a dismissal without prejudice.

But the Seventh Circuit noted that the jurisdictional dismissal did not leave plaintiffs up a preclusive creek. "[I]f [plaintiffs] later believe they can demonstrate that they have suffered an

25

injury in fact after all, perhaps on the basis of a *different* assignment or exemplar claim, they can present these claims against the same defendant in a new federal suit (assuming of course that no independent barrier, such as the statute of limitations, exists)." *Id.* (emphasis in original).

Indeed, the Seventh Circuit noted approvingly that the plaintiffs had already exercised that option. "[I]n a case brought by these plaintiffs against the same defendant and before the same district judge – which the court called 'a putative class action with slightly different facts, but consisting of virtually identical allegations under the law' – these plaintiffs *did* successfully demonstrate standing and survived a motion to dismiss." *Id.* (quoting *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 2018 WL 3420796, at *1, *7 (C.D. Ill. 2018)).

Plaintiff has done the same here. Plaintiff cites a *different* assignment and raises a *different* exemplar claim from the ones alleged in *Zurich III*. The complaint alleges that Plaintiff holds rights assigned to it by HFHP, not HIP or NHIC. *See* Cplt., at ¶ 27 (Dckt. No. 1). And it asserts the entirely new M.B. exemplar claim. *Id.* at ¶ 39.

Judge Gettleman did not consider any of these new allegations in *Zurich III*, so they are not precluded. "[T]he ruling on standing (or on some other jurisdictional prerequisite) . . . has a preclusive effect *with respect to the facts determined by that ruling*." *United States v. Funds in the Amount of $574,840*, 719 F.3d 648, 652 (7th Cir. 2013) (emphasis added) (citing *Hill v. Potter*, 352 F.3d 1142, 1146–47 (7th Cir. 2003)). The only factual determinations that Judge Gettleman made in *Zurich III* related to the particular assignments and exemplar claims raised in that case. None are at issue here.

Put another way, Plaintiff is not relitigating a factual issue that Judge Gettleman previously decided. For example, Plaintiff does not assert that the previously adjudicated

assignments (*i.e.*, those from HIP) are valid. And Plaintiff is not contending that Zurich is, in fact, the insurer of the exemplar claim assigned by NHIC.

Instead, Plaintiff raises a different assignment, from a different Medicare Advantage Organization, that covers a different representative beneficiary. Those distinctions make all the difference, and they are enough to escape the issue-preclusion bar. *See MAO-MSO Recovery II*, 935 F.3d at 582.

## III.    Statute of Limitations

Zurich next argues that M.B.'s claim is time-barred by the Medicare Secondary Payer Act's statute of limitations. *See* Def.'s Mem., at 12–13 (Dckt. No. 13). As Zurich sees it, the appropriate statute of limitations is three years, and Plaintiff's complaint is late. But as the Court will explain, Zurich comes up with the wrong number.

The Medicare Secondary Payer Act does not include a limitations period for a private right of action. *See* 42 U.S.C. § 1395y(b)(3)(A). The Act does, however, supply a three-year statute of limitations for actions brought by the government. *See id.* § 1395y(b)(2)(B)(iii).

When "there is no federal statute of limitations expressly applicable" to a lawsuit, courts typically "'borrow' the most suitable statute or other rule of timeliness from some other source." *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 158 (1983). That borrowing usually comes from state law. *See N. Star Steel Co. v. Thomas*, 515 U.S. 29, 33–34 (1995) (describing state law as the "lender of first resort"). But sometimes, courts borrow from federal law "'when a rule from elsewhere in federal law clearly provides a closer analogy than available state statute.'" *See Reed v. United Transp. Union*, 488 U.S. 319, 324 (1989) (quoting *DelCostello*, 462 U.S. at 171).

Until recently, most courts resorted to a borrowing analysis when addressing the statute of limitations for an MAO's private cause of action under the MSP Act. Courts concluded that because the Act did not itself supply a statute of limitations for a private cause of action, they needed to "borrow" from elsewhere in federal law.

Most courts naturally borrowed the three-year statute of limitations applicable to the government's cause of action under the MSP Act, and applied it to the private cause of action. *See MSP Recovery Claims, Series LLC v. Nationwide Mut. Ins. Co.*, 2022 WL 3572439, at *2 (S.D. Ohio 2022) (collecting cases). That makes a lot of sense, at first blush. The MSP Act provides twin causes of action – one by the government, and the other by private parties. From a textual perspective, they are next-door neighbors. It seems appropriate to borrow the statute of limitations from the statutory sister, and graft it on to the provision about a private cause of action.

Still, other courts have borrowed from the False Claims Act, and applied a six-year statute of limitations period. *See Manning v. Utils. Mut. Ins. Co.*, 254 F.3d 387, 393–98 (2d Cir. 2001); *see also United States v. Stricker*, 524 F. App'x 500, 505–06 & n.6 (11th Cir. 2013).

Both lines of decisions assumed that borrowing was necessary in the first place. But before resorting to borrowing, a court must first consider whether a federal statute of limitations applies. *See Berger v. AXA Network LLC*, 459 F.3d 804, 808 (7th Cir. 2006) (holding that courts must borrow limitations periods only "[w]hen Congress fails to provide a statute of limitations for a federal claim"). There is no need to borrow a limitations period if Congress has already provided one. If you can avoid it, neither a borrower nor a lender be.

The decisions above assumed that because the MSP Act's *private cause of action* provision did not itself supply a limitations period, Congress had not provided one at all. But as

28

it turns out, Congress *has* expressly provided a statute of limitations applicable to a Medicare Advantage Organization's cause of action under the MSP Act. It just happens to appear elsewhere in federal law.

Congress has enacted a "catch-all" statute of limitations period of four years that applies to some federal causes of action. *See* 28 U.S.C. § 1658(a). Section 1658(a) provides that "[e]xcept as otherwise provided by law, a civil action arising under an Act of Congress enacted after [December 1, 1990] may not be commenced later than 4 years after the cause of action accrues." *See* 28 U.S.C. § 1658(a); *see also Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 375 (2004).

The Supreme Court has held that "a cause of action 'aris[es] under an Act of Congress enacted' after December 1, 1990 – and therefore is governed by § 1658's 4-year statute of limitations – if the plaintiff's claim against the defendant *was made possible* by a post-1990 enactment." *Jones*, 541 U.S. at 382 (emphasis added) (quoting 28 U.S.C. § 1658(a)). Claims "made possible" after 1990 qualify for the catch-all statute of limitations of four years. *Id.*

The Eleventh Circuit considered whether section 1658(a)'s catch-all provision applied to a Medicare Advantage Organization's claim under the MSP Act's private cause of action. *See MSPA Claims 1, LLC v. Tower Hill Prime Ins. Co.*, 43 F.4th 1259, 1263–64 (11th Cir. 2022). The Court of Appeals held that it did. It reasoned that although the Act's private cause of action provision, 42 U.S.C. § 1395y(b)(3)(A), was enacted before 1990, Medicare Part C – which was enacted afterwards – was the proper measuring stick when it came to making the claim *possible*. *Id.*

The private cause of action provision might have preexisted section 1658(a), but the use of that cause of action by an MAO was "'made possible by' [Medicare] Part C – 'a post-1990

29

enactment.'" *Id.* (quoting *Jones*, 541 U.S. at 382). The Eleventh Circuit pointed out that Medicare Part C "created MAOs and granted them a statutory right to seek reimbursable fees, thereby empowering them to sue under the private cause of action." *Id.* at 1264. It was "only '[b]ecause of that statutory right that an MAO suffers an injury when a primary plan fails to reimburse it.'" *Id.* at 1265 (quoting *MSPA Claims 1, LLC v. Kingsway Amigo Ins. Co.*, 950 F.3d 764, 771 (11th Cir. 2020)).

Basically, claims by MAOs did not become possible until Congress enacted Medicare Part C in 1997. *Id.* at 1264. Claims by MAOs became possible after 1990, so the four-year statute of limitations applies.

Against that backdrop, the Eleventh Circuit found that section 1658(a) and its four-year statute of limitations applied. There was no need to borrow a statute of limitations from elsewhere in federal law because Congress had already provided one.

Since that decision, at least one other district court has followed the Eleventh Circuit's lead. *See Bunker Hill Ins. Co.*, 2023 WL 4744739, at *7; *but see Nationwide Mut. Ins. Co.*, 2022 WL 3572439, at *2 (a pre-*Tower Hill* opinion finding that section 1658(a) did not apply to MSP Act claims). The Seventh Circuit, for its part, has not addressed the issue.

This Court agrees with the Eleventh Circuit. There is no need to resort to borrowing here because section 1658(a)'s four-year statute of limitations applies to an MAO's cause of action under the MSP Act.

Although the private cause of action provision (which predates section 1658) is an important ingredient to an MAO's claim, Medicare Part C (which does *not* predate section 1658) does the real enabling. "[W]ithout Medicare Part C, an MAO [like HFHP] would not (1) exist, (2) have a statutory right to charge a primary payer, or (3) suffer any cognizable injury if the

30

primary payer didn't reimburse it." *See Bunker Hill Ins. Co.*, 2023 WL 4744739, at *7.

Medicare Part C makes an MAO's claim under the MSP Act possible. *See Jones*, 541 U.S. at

382. And since Medicare Part C was enacted after 1990, section 1658 applies. The Court

therefore finds that section 1658(a) provides the applicable statute of limitations of four years.

Applying that limitations period to the claims here, Plaintiff's claim is timely. Zurich

concedes that HFHP's cause of action accrued, at the earliest, on September 20, 2018 – the last

date that HFHP made conditional payments for treatment rendered to M.B. *See* Def.'s Mem., at

13 (Dckt. No. 20). Plaintiff filed this case on September 16, 2022. *See* Cplt. (Dckt. No. 1).

Because the complaint was filed less than four years after HFHP's claim accrued, Plaintiff's suit

is timely.

## IV.    Equitable Accounting (Count II)

Finally, Zurich asks the Court to dismiss Count II to the extent that it seeks equitable

accounting. *See* Def.'s Mem., at 13 (Dckt. No. 20).

Count II seeks declaratory relief under 28 U.S.C. § 2201 as to HFHP's unreimbursed

payments, above and beyond M.B.'s claim. *See* Cplt., at 18–21 (Dckt. No. 1). According to

Plaintiff, there are many more people like M.B. out there. And there are many more conditional

payments to recoup.

Zurich allegedly "entered into settlements with *beneficiaries* relating to accidents but

failed to reimburse HFHP for accident-related medical expenses." *Id.* at ¶ 70 (emphasis added).

Beneficiaries, *plural*. M.B.'s claim is just the tip of the iceberg.

Plaintiff wants to get its hands on records showing Zurich's serial delinquency when it

comes to reimbursing HFHP. So, Count II asks for "a declaratory judgment from this Court

establishing that Zurich has a historical, present, and continuing duty to reimburse HFHP for

payments made on behalf of beneficiaries' accident-related medical expenses." *Id.* at ¶ 73. Plaintiff "also seeks a declaration of what amounts are due and owing by Zurich to HFHP." *Id.*

The problem is that Plaintiff doesn't know how many of HFHP's conditional payments have gone unreimbursed. By Plaintiff's telling, there are a lot – they simply have yet to be unearthed. *Id.* at ¶ 25 ("[T]he bulk of those [unreimbursed conditional] payments remain hidden without additional discovery.").

The only way to start digging, as Plaintiff sees it, is for Zurich to hand over "thousands of claims data and data points." *Id.* at ¶ 77. Plaintiff alleges that it needs to see Zurich's records "to determine overlapping instances where HFHP made payment of medical items and services on behalf of a Medicare beneficiary who was entitled to the benefit of insurance coverage provided by Zurich." *Id.*

Plaintiff alleges that it has tried playing nice, but Zurich hasn't been forthcoming. *Id.* at ¶ 84 ("MSPRC 44 has attempted to coordinate with Zurich for an exchange of information a[s] to numerous beneficiaries, but Zurich ignored or resisted these efforts."). Zurich has yet to fork over its data so that Plaintiff can identify other possible claims.

So, Plaintiff asks the Court for "[a]n equitable accounting of the amounts owed MSPRC 44 by Zurich," documenting "all instances where Zurich settled a tort claim under a third-party insurance policy or accepted coverage under a first party insurance policy." *Id.* at ¶¶ 82–83. Plaintiff hopes to show from the accounting that Zurich has failed to properly reimburse HFHP for its conditional payments made on behalf of an untold number of Medicare beneficiaries.

Zurich balks at that request. *See* Def.'s Mem., at 13–14 (Dckt. No. 20). As Zurich sees it, MSP is using the remedy to fish for claims, not redress them. *Id.* at 13. The Court agrees.

In Illinois, "[a]n accounting is a statement of receipts and disbursements to and from a particular source."[4]  *Tufo v. Tufo*, 196 N.E.3d 58, 82 (Ill. App. Ct. 2021) (citing *Devyn Corp. v. City of Bloomington*, 38 N.E.3d 1266, 1278 (Ill. App. Ct. 2015)).  "The right to an accounting is not an absolute right, but one which should be accorded only on equitable principles."  *Id.* (quoting *Tarin v. Pellonari*, 625 N.E.2d 739, 748 (Ill. App. Ct. 1993)).  A trial court has broad discretion to order an equitable accounting, and will not do so unnecessarily.  *See Devyn Corp.*, 38 N.E.3d at 1279; *Tarin*, 625 N.E.2d at 749 ("[I]t is axiomatic that an accounting will not be ordered if the circumstances are such as to make it unnecessary or improper.").

To state a cause of action for an equitable accounting, a complaint must allege "the absence of an adequate remedy at law and one of the following:  (1) a breach of a fiduciary relationship between the parties; (2) a need for discovery; (3) fraud; or (4) the existence of mutual accounts which are of a complex nature."  *Chicago Architectural Metals, Inc. v. Bush Constr. Co.*, 201 N.E.3d 148, 160 (Ill. App. Ct. 2022) (quoting *People ex rel. Hartigan v. Candy Club*, 501 N.E.2d 188, 190 (Ill. App. Ct. 1986)); *see also ABM Marking, Inc. v. Zanasi Fratelli, S.R.L.*, 353 F.3d 541, 545 (7th Cir. 2003).  The plaintiff bears the burden of establishing that he has the right to an accounting.  *See Tarin*, 625 N.E.2d at 749.

Plaintiff's complaint doesn't clear the first hurdle.  The complaint fails to allege that an adequate remedy at law does not exist for its claim that Zurich owes HFHP for unreimbursed conditional payments.  And as far as this Court can tell, there is one:  the Medicare Secondary Payer Act provides a cause of action and a remedy – damages – for that very harm.  *See* 42 U.S.C. § 1395y(b)(3)(A) ("[T]here is established a private cause of action for damages . . . in the case of a primary plan which fails to provide for primary payment.").  Plaintiff should know –

---

[4]  In its response, Plaintiff clarifies that its request for an equitable accounting arises under state law.  *See* Pl.'s Resp., at 14 (Dckt. No. 26) (citing *Tufo v. Tufo*, 196 N.E.3d 58 (Ill. App. Ct. 2021)).

after all, Plaintiff brings a claim for damages under that Act in this lawsuit. *See* Cplt., at ¶¶ 58–67 (Dckt. No. 1) (Count I).

Plaintiff asserts that equitable accounting "is proper because the facts and accounts presented are so complex that adequate relief may not be obtained at law." *Id.* at ¶ 82. But Plaintiff provides no case law in support of its assertion that accounting complexity has any bearing on the adequacy of a remedy. In fact, the requirements for an equitable accounting action make the "complex nature" of accounts an entirely separate element that a plaintiff must plead *in addition* to the absence of an adequate remedy at law. *See Chicago Architectural Metals*, 201 N.E.3d at 160. Complexity alone cannot justify an accounting.

Plaintiff next argues that it lacks an adequate legal remedy because Zurich has refused its requests for Zurich's claims data. *See* Cplt., at ¶¶ 83–85 (Dckt. No. 1); *see* Pl.'s Resp., at 14 (Dckt. No. 26) (arguing that "Zurich's refusal to coordinate its data with HFHP[] . . . properly alleges the elements of an accounting"). Plaintiff has tried to get the data, but Zurich has resisted. *See* Cplt., at ¶¶ 84–85. But that argument overreaches.

At the end of the day, Plaintiff seeks a remedy that would allow it to rifle through Zurich's records to identify other claims that it *thinks* are out there. But Plaintiff fails to provide any facts to support that belief, besides the lone M.B. claim. The Court will not indulge that speculation with the award of sweeping equitable relief. *See Taha v. Int'l Bhd. Of Teamsters, Loc. 781*, 947 F.3d 464, 469 (7th Cir. 2020) (holding that courts "may reject sheer speculation, bald assertions, and unsupported conclusory statements" at the motion to dismiss stage). An accounting is not a way to poke and prod through corporate records, and probe around to look for other possible claims.

At bottom, the claim does not seem like a claim at all. It seems like a request for help to *find* a claim. *Lots* of claims. In effect, Plaintiff hopes to use the claim involving M.B. as bait, and cut it up and chum the waters in the hope of landing bigger fish. Or, to be more exact about it, a *school* of fish. Plaintiff wants to use the claim about M.B. to catch something else.

Speculative and far-reaching discovery is not what the equitable accounting remedy is for. *See Profile Prods., LLC v. Soil Mgmt. Techs., Inc.*, 155 F. Supp. 2d 880, 885 (N.D. Ill. 2001) ("[Counterclaimant's] argument that it lacks an adequate remedy at law is that it needs additional discovery. That is not what is meant by the term.") (citing *Rice & Adams Corp. v. Lathrop*, 278 U.S. 509, 513 (1929)); *Gas Tech. Inst. v. Rehmat*, 524 F. Supp. 2d 1058, 1073 (N.D. Ill. 2007) (holding at summary judgment that "difficulties with discovery" were insufficient to justify equitable accounting); *Oil Express Nat'l, Inc. v. Latos*, 966 F. Supp. 650, 652 (N.D. Ill. 1997) ("The need to examine [a party's] business records is not a sufficient justification for an equitable accounting.").

For similar reasons, other courts have dismissed this Plaintiff's request for equitable accounting in MSP Act cases. *See MSP Recovery Claims Series 44, LLC v. The Commerce Ins. Co.*, No. 4:22-cv-40109 (D. Mass. 2023) (Dckt. No. 27). This Court does the same here.

The Court has another concern, too. Plaintiff's request for equitable accounting appears to be the latest page in a long playbook of seeking to identify unpled claims through litigation. That's not how the process is meant to work. Discovery is a vehicle to pursue claims, not uncover them in the first instance. *See EEOC v. Harvey L. Walner & Assocs.*, 91 F.3d 963, 971–72 (7th Cir. 1996) ("[D]iscovery is not to be used as a fishing expedition."); *Todd ex rel. Todd v. Merrell Dow Pharms., Inc.*, 942 F.2d 1173, 1178 (7th Cir. 1991) ("[S]peculation that [defendant] must possess unspecified additional information is not sufficient grounds to embark upon a

virtually boundless fishing expedition.")  At bottom, Plaintiff is not suing *about* a claim –
Plaintiff is suing to *find* a claim.  *Lots* of claims.

In fact, the Seventh Circuit has expressed misgivings toward this tactic in this very type
of case.  *See MAO-MSO Recovery II*, 994 F.3d at 871 ("This lawsuit [brought by MSP Recovery
entities and affiliates] mirrors scores like it filed in federal courts throughout the country that all
have the earmarks of abusive litigation and indeed have drawn intense criticism from many a
federal judge.  The plaintiffs should think hard before risking a third strike within our Circuit.").
MSP Recovery entities have been warned against seeking "to use the litigation process itself (in
particular, discovery) as their pathway to identifying any value in the assigned receivables and
then pursuing any available collection."  *Id.* at 873.  Plaintiff's speculative request for an
equitable accounting did not heed that warning.  But this Court will.

Plaintiff has identified one claim in this case:  M.B.'s.  While Plaintiff is entitled to
discovery with respect to that claim – for example, identifying whether Zurich is in fact M.B.'s
insurer – the Court forewarns that it will reject any attempt to exploit litigation to uncover unpled
claims whose existence is supported only by speculation.  *See* Fed. R. Civ. P. 26(b)(1) (noting
that the scope of discovery is limited to "matter that is relevant to any party's claim or defense
and proportional to the needs of the case"); *see also MSP Recovery Claims, Series LLC v. Tower
Hill Prime Ins. Co.*, 2022 WL 1624811, at *1 (N.D. Fla. 2022) ("Plaintiffs cannot use a single
pleaded claim to recover on dozens or hundreds of claims they have not pleaded or given
Defendants an opportunity to respond to before trial.")  Discovery will be constrained
accordingly.

In sum, Plaintiff has failed to adequately allege that it lacks an adequate remedy at law.
The Court declines the request to use an equitable accounting to uncover potential claims

involving other beneficiaries.  The Court therefore dismisses Count II without prejudice to the extent that Plaintiff seeks an equitable accounting.

## Conclusion

For the foregoing reasons, Defendant's motion to dismiss is denied in part and granted in part.

Date:  August 15, 2023

Steven C. Seeger
United States District Judge